## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND SEARCH WARRANTS

I, Robert R. LeFebre, being duly sworn, depose and state as follows:

INTRODUCTION

1.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2.      I am employed as a detective with the Lawrence Police Department, where I have worked since 1999.  I currently am assigned as a Task Force Officer to Immigration and Customs Enforcement, Homeland Security Investigations ("HSI") and have been so assigned since November 2020.  More specifically, I am assigned to the Organized Crime Drug Enforcement Task Force ("OCDETF"), which is a task force comprised of federal, state, and local law enforcement officers.  I previously was assigned to the Drug Enforcement Administration ("DEA"), and in particular to Task Force 4 – Cross Borders Initiative, which is a task force incorporating federal, state, and local law enforcement officers, from 2010 to 2020.  I am a graduate of the Lowell Police Academy.  I currently am deputized as a Task Force Officer with HSI and DEA.

3.      I am authorized to investigate violations of the laws of the United States, including violations of federal narcotics laws in Title 21 of the United States Code.  I have received training regarding narcotics investigations while attending the police academy and have attended additional specialized training courses in furtherance of my past and current assignments, including the Basic Narcotic Investigation course conducted and presented by the DEA training staff.

4.      I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations, and the court-authorized interception of communications.  I have also reviewed taped conversations and telephone, financial, and drug records.  Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs.

5.      During my time with DEA and HSI, I have participated in numerous wiretap investigations, and I have been a co-case agent for three such investigations.  In connection with my participation in prior wiretap investigations, I have listened to intercepted communications, reviewed transcripts of those communications, and reviewed intercepted text messages and Blackberry pin to pin messages.  I also have conducted physical surveillance in connection with wiretap investigations, as well as utilized GPS devices on automobiles and GPS information for cellular telephones to surveil targets of wiretap investigations.  I have worked with cooperating witnesses in conjunction with wiretap investigations and have debriefed targets of wiretaps after they have been arrested.  I also have executed search warrants during the course of wiretap investigations, and participated in seizures of drugs and drug proceeds in connection with such investigations.

6.      Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate and further their drug-trafficking activities.  However, drug traffickers are aware of law enforcement's use of electronic surveillance, and thus frequently endeavor to thwart detection by changing cellular telephone numbers, using multiple

cellular phones at the same time, and/or utilizing prepaid cellular phones where the user of the phone is not required to provide personal identifying information.  I am also aware that drug traffickers frequently "drop" or change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance.  I am familiar with the manner in which narcotics traffickers use coded, veiled, or slang-filled telephone conversations when discussing their illegal business, in an effort to further prevent detection, and that they often use text messages in lieu of telephone calls to avoid speaking over the telephone.  I am familiar with the "street" language used by drug traffickers, as well as the methods they use to disguise conversation and operations.

7.      I am familiar with the facts and circumstances of the investigation described herein based on my personal participation in this investigation since approximately May 2020.  I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information (whether received directly or indirectly) that I believe to be reliable from numerous sources including the following:

1.  My training and experience investigating narcotics-trafficking and money-laundering crimes;

2.  Oral reports, written reports, and documents that I have received from HSI and other federal, state, and local law enforcement agents;

3.  Physical surveillance conducted by me and other federal, state, and local law enforcement officers;

4.  Confidential sources of information and cooperating witnesses;

5.  Public records;

6.  Business records;

7.  Telephone toll records, pen register and trap and trace information, and telephone subscriber information;

8. Precise location information for telephones used by some of the Target Subjects;

9. Global positioning system tracking information;

10. Consensually recorded telephone calls;

11. Intercepted communications;

12. Search warrants for packages;

13. Drug and money seizures; and

14. Queries of law enforcement records and intelligence databases.

PURPOSE OF AFFIDAVIT

8.      I submit this affidavit in support of a Criminal Complaint charging the following

individuals with violating Title 21, United States Code, Section 846 (conspiracy to distribute

fentanyl, cocaine, and other controlled substances):

1.  Joseph CORREA;

2.  Jose MARTINEZ a/k/a/ "Bebo" ("J. MARTINEZ");

3.  Luis MARTINEZ ("L. MARTINEZ");

4.  Alberto MARRERO a/k/a "Gordo";

5.  Madeline CORREA-DONES;

6.  Mayi ROSARIO ("M. ROSARIO");

7.  Sonyi ROSARIO ("S. ROSARIO");

8.  Victor RAMON MELENDEZ ("RAMON");

9.  Fauris GUERRERO VALDEZ a/k/a "Duro";

10. Luis PEREZ FRIAS;

11. Freddy REYES CONCEPCION a/k/a Frachye Gonzalez Irizarry ("REYES");

12. Alex Rafael HERNANDEZ MERCEDES;

13. Felipe MARTINEZ;

14. Elvis DEJESUS;

15. William Rivadeneira a/k/a "WILL" ("WILL");

16. Gregorit SANCHEZ;

17. Jeremy EATON;

18. Pablo PIZARRO-ROSA a/k/a "Chiquitin";

19. Othoniel Lara Gonzalez a/k/a "Jose Ramirez" a/k/a "Anibal Pena" a/k/a

"Chiripa" ("CHIRIPA"); and

20. Zacharia MOHAMED,

collectively, the "Target Subjects."

9. This affidavit also is being submitted in support of applications for search

warrants for the following locations:

1. 190 Carleton Street, First Floor, Lawrence, Massachusetts (CORREA's

residence) ("Target Location #1");

2. All American Self Storage, 255 Hampstead Street, Methuen, Massachusetts,

Unit 131 (CORREA's storage unit) ("Target Location #2");

3. 33 Portland Street, Third Floor, Lawrence, Massachusetts (S. ROSARIO's

residence) ("Target Location #3");

4. 324 High Street, Third Floor, Lawrence, Massachusetts (MARRERO's

residence) ("Target Location #4");

5. 160 Parker Street, Third Floor, Lawrence, Massachusetts (J. MARTINEZ's

residence) ("Target Location #5");

6.   244 Mount Vernon Street, Apartment 5, Lawrence, Massachusetts (L.

MARTINEZ's Massachusetts residence) ("Target Location #6");

7.   111 Margin Street, Second Floor, Lawrence, Massachusetts (MARTINEZ's

residence) ("Target Location #7");

8.   170 Washington Street, Apartment 509, Haverhill, Massachusetts (WILL's

residence) ("Target Location #8"); and

9.   10 Clarence Terrace, Second Floor, Lawrence, Massachusetts (PEREZ

FRIAS's residence ("Target Location #9"),

collectively, the "Target Locations."

10.     This affidavit does not set forth all the facts developed during the course of this

investigation. Rather, it sets forth only those facts that are necessary and sufficient to establish

probable cause to believe that the Target Subjects identified herein have committed the above-

described controlled substance offense, and that evidence, fruits, and instrumentalities of drug

trafficking will be found in the Target Locations as described below.

## SUMMARY OF EVIDENCE

11.     In May 2020, other investigators and I began an investigation into a Lawrence-

based cocaine distribution organization.  Since December 2020, investigators with the Boston

OCDETF Strike Force have conducted court-authorized interceptions of telephones used by

some of the Target Subjects and their associates.  A list of interception orders is attached hereto

as Attachment A.  Interceptions have shown that the Target Subjects are distributing fentanyl and

cocaine in and around Lawrence, Massachusetts.

12.     More specifically, interceptions have shown that CORREA, L. MARTINEZ, and

J. MARTINEZ obtain cocaine from drug suppliers located in Puerto Rico.  CORREA, L.

MARTINEZ, and J. MARTINEZ regularly travel to Puerto Rico to purchase kilograms of cocaine.  They and their associates, including CORREA-DONES, who is their mother, then mail packages containing the cocaine to addresses in New York, Massachusetts, and New Hampshire. Agents have intercepted and obtained search warrants for some of the packages mailed by or on behalf of CORREA, L. MARTINEZ, and J. MARTINEZ.  In addition, agents have identified other packages mailed by or on behalf of CORREA, L. MARTINEZ, and J. MARTINEZ that have been delivered to addresses in Massachusetts and New Hampshire and collected by the Target Subjects.  Associates including S. ROSARIO, DEJESUS, and PEREZ FRIAS receive packages containing cocaine on CORREA's behalf.  CORREA also has obtained cocaine locally from one of his Puerto Rico-based drug suppliers.  RAMON works as a courier for that drug supplier.  CORREA also obtains and distributes fentanyl.  CORREA obtains fentanyl locally from GUERRERO VALDEZ.[1]

13.     CORREA employs couriers and stash house operators, including MARRERO and PEREZ FRIAS, to store and distribute drugs.  He also works with M. ROSARIO, who is the mother of his children, and S. ROSARIO, who is M. ROSARIO's sister, to receive and distribute drugs.  CORREA sells drugs in both wholesale and retail quantities.  Prior to June 2021, DEJESUS obtained cocaine from CORREA.

14.     Interceptions also have shown that MARTINEZ and DEJESUS work together to obtain and distribute drugs.  MARTINEZ regularly obtains cocaine from REYES, who employs HERNANDEZ MERCEDES as a courier and stash house operator.[2]  MARTINEZ and

---

[1] In affidavits previously filed with this Court and with the Honorable F. Dennis Saylor IV, I identified "Duro" as Alexander Rafael GUERRERO RODRIGUEZ.  At this time, I believe that identification was in error and that GUERRERO VALDEZ is "Duro."

[2] In affidavits previously filed with this Court and with the Honorable F. Dennis Saylor IV, I stated that I believed the courier working for REYES was Alexis Luciano Cespedes.  Based on the fact that HERNANDEZ MERCEDES was stopped on December 8, 2021 in possession of

DEJESUS employ WILL to assist with drug distribution.  Until June 2021, WILL mainly conducted retail sales of drugs.  DEJESUS primarily handled wholesale drug transactions with customers including MOHAMED and EATON.  However, in August 2021, DEJESUS was arrested on state firearms charges and detained in state custody.  In the wake of his arrest, WILL assumed more responsibility and began distributing wholesale quantities of drugs, including fentanyl and cocaine, including to EATON.

15.     While detained at the Middleton House of Correction, DEJESUS obtained a contraband cellphone with SANCHEZ's assistance.  DEJESUS then arranged for SANCHEZ to bring a package containing drugs to him in jail.  The package, which was seized by investigators, was supplied by WILL and MARTINEZ.

16.     Prior to his arrest, DEJESUS distributed cocaine to PIZARRO-ROSA. PIZARRO-ROSA is a redistributor who sells drugs to multiple customers, including CHIRIPA. CHIRIPA likewise is a drug redistributor.  In recent months, CHIRIPA has been in contact with REYES, and agents believe he has been obtaining cocaine from him.

17.     The Target Subjects have been identified as the users of the telephones attributed to them through a combination of physical surveillance of activity consistent with intercepted communications, precise location information for telephones, subscriber information for telephones, identification by name during intercepted communications, and voice comparison with intercepted calls over other telephones known to be used by a Target Subject.

PROBABLE CAUSE

18.     This section of the affidavit is divided into four parts.  The first part describes seizures of drugs and drug proceeds from some of the Target Subjects during the course of our

---

a kilogram of cocaine and the telephone used by REYES's courier, I now believe that the courier working for REYES was HERNANDEZ MERCEDES.

investigation.  The second part describes intercepted communications and physical surveillance showing the above-described relationships between the Target Subjects.  The third part focuses on the Target Locations and their connection to criminal activity.  And the fourth part discusses drug traffickers' use of residences and cellphones generally.

Seizures of Drugs and Drug Proceeds from the Target Subjects.

19.     Since February 2021, agents have seized drugs or drug proceeds from or connected to each of the Target Subjects other than MARRERO and MOHAMED.  These seizures are described below.

On February 4, 2021, Agents Seized $75,930 in Drug Proceeds from L. MARTINEZ.

20.     On February 3, 2021, agents intercepted calls over Target Telephone #1 during which PIZARRO-ROSA spoke with DEJESUS, who was using Target Telephone #5.  During the calls, DEJESUS requested that PIZARRO-ROSA provide him with money because DEJESUS was meeting with an associate the following day.

21.     On the morning of February 4, 2021, agents began conducting surveillance at DEJESUS's then-residence at 36 Ashland Street, North Andover, Massachusetts.  Agents observed a grey Mercedes with Massachusetts registration 3AVK29 registered to Luis MARTINEZ, 23F Boxford Street, Lawrence, Massachusetts (the "Mercedes"), arrive and park on the street outside of 36 Ashland Street.  DEJESUS exited 36 Ashland Street carrying a brown paper shopping bag.  DEJESUS entered the front passenger seat of the Mercedes with the bag.  Moments later, DEJESUS exited the Mercedes empty-handed and reentered 36 Ashland Street.  The Mercedes then left the area and traveled to a Holiday Inn Express located at 224 Winthrop Avenue, in Lawrence, where it parked in the parking lot.

22.     Agents observed L. MARTINEZ exit the Mercedes carrying a brown paper shopping bag.  L. MARTINEZ entered the Holiday Inn Express.  Approximately an hour later, agents observed L. MARTINEZ exit the Holiday Inn Express carrying a weighted white plastic shopping bag.  L. MARTINEZ approached a maroon Kia Optima with Connecticut registration AX41159, registered to EAN Holdings LLC, which does business as Enterprise-Rent-A-Car (the "Optima").  The Optima was parked directly next to the Mercedes and occupied by a male later identified as Randy Nieves.  L. MARTINEZ placed the white shopping bag in the back seat of the Optima and reentered the Holiday Inn Express.  Approximately fifteen minutes later, L. MARTINEZ again exited the Holiday Inn Express and entered the front passenger seat of the Optima.  L. MARTINEZ and Nieves then traveled in the Optima from the Holiday Inn Express to a gas station located across the street before getting on interstate 495 southbound.

23.     The Optima was subsequently stopped by a marked Massachusetts State Police unit for speeding.  L. MARTINEZ consented to a search of the white plastic shopping bag in the rear of the Optima.  L. MARTINEZ retrieved the bag and placed it on the hood of the State Police cruiser.  The white plastic bag contained a brown paper shopping bag, which contained $75,930 in bundled cash.  When asked, L. MARTINEZ identified the total amount as approximately $75,000.  L. MARTINEZ stated that the money was his and was from his business.  L. MARTINEZ declined to elaborate on the name or nature of his business.  Nieves disclaimed ownership of the money and stated that he was driving his friend from Lawrence to the Bronx.  The money was seized by police.  L MARTINEZ and Nieves were not arrested. They subsequently left in the Optima, and surveillance was discontinued.  Based on subsequent intercepted calls, L. MARTINEZ and Nieves did not travel to the Bronx, but instead returned to Lawrence.

24.     On February 4, 2021, at approximately 5:36 p.m., agents intercepted a call over Target Telephone #3 during which MARTINEZ spoke with DEJESUS, who was using Target Telephone #4.  During the call, DEJESUS said, "What I was going to tell you?  You know, man, the guy was pulled over in Connecticut."  MARTINEZ said, "Oh boy!"  DEJESUS said, "You already know."  MARTINEZ asked, "With everything on?"  DEJESUS affirmed.  MARTINEZ acknowledged, and DEJESUS clarified, "With the money."  MARTINEZ then said, "You already know, you are not getting that back."  DEJESUS said, "You already know."  MARTINEZ asked, "And he was driving like that?"  DEJESUS asked, "Huh?"  MARTINEZ repeated, "He was driving like that?"  DEJESUS asked what MARTINEZ meant, and MARTINEZ explained, "That if the money was just there like that."  DEJESUS affirmed, "Yes, man.  It looks like they rented a car, man."  DEJESUS continued, "The guy is worried . . . hold on.  He told me that [aside: Two.  Where are we going now?  Right there, right?]  You heard?  The guy said he would give me ten on Tuesday right away.  But I told him not to worry about it because that happens, you know?"

25.     Based on my training and experience, as well as my familiarity with this investigation, I believe that on February 3, 2021, DEJESUS requested payment for drugs from PIZARRO-ROSA.  I believe that on February 4, 2021, DEJESUS gave drug proceeds to L. MARTINEZ for remission to L. MARTINEZ's and CORREA's drug supplier.  I believe that later that day, DEJESUS used Target Telephone #4 to tell MARTINEZ that L. MARTINEZ had been stopped by police ("the guy was pulled over in Connecticut").  I believe that DEJESUS stated that L. MARTINEZ had been in possession of the drug proceeds ("With the money") when he was stopped by police, and that MARTINEZ stated that DEJESUS would not be able to retrieve the money from police ("you are not getting that back").  I believe that DEJESUS said

that L. MARTINEZ or CORREA had offered to give him drugs or money after the seizure ("give me ten on Tuesday").

> On March 18, 2021, Agents Seized 200 Grams of Cocaine Supplied by DEJESUS and PIZARRO-ROSA from CHIRIPA.

26.     On March 18, 2021, agents intercepted calls that showed that PIZARRO-ROSA was planning to receive 200 grams of cocaine from DEJESUS and redistribute them to CHIRIPA.  More specifically, at approximately 11:46 a.m. that morning, agents intercepted a call over Target Telephone #1 during which PIZARRO-ROSA spoke with CHIRIPA.  During the call, CHIRIPA said he had spoken with an associate from Boston.  CHIRIPA said, "He told me he has it at thirty-four.  I'm calling you to let you know I will leave it at the same and I want 200."  When PIZARRO-ROSA asked for clarification, CHIRIPA said that his associate had "something at thirty-four," and that he was "calling to see if [PIZARRO-ROSA] ha[d] it like that."  PIZARRO-ROSA said, "No, they are giving it to me for thirty-four.  I can give it to you at thirty-five.  That's all."  CHIRIPA said he would call back.

27.     At 12:16 p.m. that afternoon, PIZARRO-ROSA used Target Telephone #1 to call DEJESUS.  During the call, which was intercepted, PIZARRO-ROSA said, "You told me with the, around exit three?"  DEJESUS said, "No, with exit three I told you I have something there that someone is offering me."  PIZARRO-ROSA said, "[S]omeone called me with, with, but he is not willing to pay more than with the four."  DEJESUS asked, "For a whole one?"  PIZARRO-ROSA said, "No, man, no, just two."  DEJESUS exclaimed, and PIZARRO-ROSA clarified, "Two hundred bucks."  DEJESUS said he had a dentist appointment and then said, "I'll deal with you if you give me some time."  PIZARRO-ROSA equivocated as to whether it was worthwhile to do the transaction for so little profit.  DEJESUS said, "[D]on't worry.  We'll work something out, don't worry."  Over the course of the afternoon and evening, PIZARRO-ROSA and

DEJESUS spoke several times, with DEJESUS ultimately telling PIZARRO-ROSA that he

would call when he was home.  PIZARRO-ROSA told DEJESUS, "Now it's two and a half."

28.     At approximately 6:23 p.m., DEJESUS called PIZARRO-ROSA at Target

Telephone #1.  The call was intercepted.  DEJESUS said, "Listen, I'm eight minutes away,

getting your stuff. I'm eight minutes away from the stuff, according to the GPS."  PIZARRO-

ROSA said, "Okay," and DEJESUS said, "No, not from the stuff, from the house. Because I'm

heading down."  PIZARRO-ROSA agreed.  At 6:40 p.m., PIZARRO-ROSA used Target

Telephone #1 to tell DEJESUS to "[a]dd another hundred bucks to the appointment."  DEJESUS

agreed.  At 7:02 p.m., DEJESUS was intercepted over Target Telephone #1 telling PIZARRO-

ROSA that he would arrive in five minutes.

29.     Based on my training and experience, as well as my familiarity with this

investigation, I believe that during this series of calls, CHIRIPA asked to purchase 200 grams ("I

want 200") of cocaine for $34.00 per gram ("at thirty-four").  I believe that PIZARRO-ROSA

originally quoted a price of $35.00 per gram ("thirty-five").  I believe that PIZARRO-ROSA

then attempted to negotiate the price at which he could purchase the cocaine from DEJESUS

down to $33.00 per gram ("exit three").  I believe that DEJESUS asked if the transaction was for

a kilogram of cocaine ("a whole one"), and that PIZARRO-ROSA told him it was for 200 grams

("Two hundred bucks").  I believe that PIZARRO-ROSA and DEJESUS ultimately reached an

agreement on price and that DEJESUS agreed to deliver the drugs.  I believe that PIZARRO-

ROSA increased his order to 350 grams ("Now it's two and a half"; "[a]dd another hundred

bucks to the appointment").

30.     At approximately 7:14 p.m. that day, agents conducting surveillance observed

DEJESUS arrive at 32 Exchange Street, Lawrence, Massachusetts and enter the residence.  A

few minutes later, DEJESUS exited 32 Exchange Street and left the area.  Based on my training

and experience, as well as my familiarity with this investigation, I believe that DEJESUS

delivered 350 grams of cocaine to PIZARRO-ROSA inside of 32 Exchange Street.

      31.    At approximately 7:19 p.m., PIZARRO-ROSA used Target Telephone #1 to call

CHIRIPA and ask him to "pass by" his location.  CHIRIPA said, "I'll pass by there to check it

out, eh?"  PIZARRO-ROSA said, "Yes, to check it out.  No, it's really good."  CHIRIPA agreed

to call in ten minutes.  At 7:26 p.m., CHIRIPA called PIZARRO-ROSA and told him he was

parking.  PIZARRO-ROSA said, "Come up," and agreed to open the door.

      32.    Thereafter, at approximately 7:28 p.m., agents observed a male enter 32 Exchange

Street.  Agents then observed that a vehicle agents previously had observed CHIRIPA driving

was parked in front of 30 Exchange Street.  Approximately ten minutes later, a male exited 32

Exchange Street, entered the car known to be used by CHIRIPA, and drove a short distance.  A

marked Lawrence Police unit attempted to stop CHIRIPA at my direction.  CHIRIPA did not

immediately stop and instead continued to 435 Broadway, in Lawrence, where he resides.

CHIRIPA pulled into the parking lot of 435 Broadway and quickly exited his car.  The police

officer approached CHIRIPA in the parking lot and requested his license.  Additional officers

arrived on scene.  CHIRIPA stated that he did not have a license and lived at 435 Broadway.

CHIRIPA stated that he had been running errands.

      33.    Officers towed CHIRIPA's car and subsequently located a clear plastic bag

containing approximately 200 grams of a substance that field tested positive for cocaine under

the front passenger seat.  Based on my training and experience, I believe that PIZARRO-ROSA

distributed the 200 grams of cocaine to CHIRIPA inside of his residence at 32 Exchange Street.

34.     That night, at approximately 8:15 p.m., CHIRIPA was intercepted telling

PIZARRO-ROSA that he had been stopped by police and that he had left "200" under the seat.

> In April 2021, Agents Obtained Search Warrants for Five Packages Mailed on Behalf of
> CORREA and Seized Nearly Six Kilograms of Cocaine.

35.     Between April 9 and 21, 2021, agents executed search warrants on five U.S.

Postal Service Priority Mail packages sent on behalf of CORREA to addresses in Massachusetts

and New York.  In total, agents seized approximately 5.8 kilograms of cocaine from the

packages.  Via video and physical surveillance, agents were able to observe CORREA-DONES,

who is CORREA's mother, an unidentified female accompanied by CORREA-DONES, and L.

MARTINEZ, who is CORREA's brother, traveling to post offices in Puerto Rico to send the

packages.

36.     Among the searched packages were packages addressed to Carlos Flores at 160

Parker Street, Second Floor, Lawrence, Massachusetts, which is the same building as Target

Location #5, and Marco Lopez at 36 Ashland Street, North Andover, Massachusetts.  Based on

physical, pole camera, and electronic surveillance, I am aware that at that time, DEJESUS was

living at 36 Ashland Street, North Andover, Massachusetts.  As set forth below, I also am aware

that J. MARTINEZ was (and still is) living at 160 Parker Street, Third Floor, Lawrence,

Massachusetts, which is Target Location #5.  The package addressed to 36 Ashland Street

contained approximately 1,090 grams of a substance that field tested positive for cocaine.  The

package addressed to 160 Parker Street contained approximately 1,000 grams of a substance that

field tested positive for cocaine.

37.     On April 16, 2021, at approximately 12:15 p.m., agents intercepted a call over

Target Telephone #5 during which DEJESUS spoke with CORREA.  During the call, CORREA

asked, "A half, how much?"  DEJESUS said, "Huh?" and CORREA said, "A half."  DEJESUS

asked, "Is it ready?  How much is the half?'  CORREA said, "My brother . . . ."  DEJESUS then

stated, "Where is it?  Where is it?  Of course I want it.  You know that I want it."  CORREA then

said, "Not that if you want it, I need one.  It's for me."  DEJESUS then said, "Oh, no, no

brother."  CORREA asked, "We are looking ugly?" and DEJESUS replied, "We are type ugly,

but for a couple of days."  CORREA then said, "No, it's the same on the island."  CORREA then

asked, "Dude, can you do, dude, that thing never arrived to your house, bro?"  DEJESUS said,

"It never arrived."  CORREA then said, "Never, not even theirs, you heard?"  They then agreed

that it was "fucked up," and CORREA said, "Fucker, you know how many I have up in the air?"

DEJESUS asked how many, and CORREA said, "I also have my stuff, remember that they never

arrived last Wednesday, nor last Tuesday.  There's five up in the air, son.  Five, son."  Later in

the call, CORREA said, "I'm not going to be sending anything through the mail."

38.     Based on my training and experience, as well as my familiarity with this

investigation, I believe that during this call CORREA asked DEJESUS to supply CORREA with

half a kilogram of cocaine ("A half').  I believe that DEJESUS at first thought that CORREA

was offering to send him half a kilogram of cocaine ("Is it ready?  How much is the half?").  I

believe that when CORREA clarified that he wanted to purchase a half kilogram of cocaine ("I

need one"), DEJESUS stated that he could not supply CORREA with the drugs.  I believe that

later in the call, CORREA asked whether the package addressed to DEJESUS's house, which

was seized by law enforcement and found to contain a kilogram of cocaine, had arrived ("that

thing never arrived to your house, bro").  I believe that CORREA stated that other packages he

had sent had also not arrived, and that he had five packages or five kilograms of drugs ("five up

in the air") that had not reached their destinations.

<u>On July 30, 2021, Agents Obtained a Search Warrant for a Package Mailed on Behalf of</u>
<u>CORREA to 33 Portland Street and Seized 500 Grams of Cocaine.</u>

39.     On July 30, 2021, agents seized a package mailed from "Antonio aponte, Calle.

La Hija del caribe #133, San Juan. P.R. 00918" to "Jorge aponte, 33 Portland St. 2 Floor,

Lawrence, mass, 01843," which is within the same residential structure as S. ROSARIO's

residence and Target Location #3.  Agents obtained a search warrant for the package and found

that it contained half a kilogram of a substance that field tested positive for cocaine.

40.     On July 31, 2021, at approximately 11:41 a.m., agents intercepted a call over

Target Telephone #13 during which CORREA spoke with a male using telephone number (978)

397-1288 identified as Richie Gonzalez.  During the call, CORREA asked, "Fucking, what's that

nigga's name?  The nigga that works in the mail, bro?"  Gonzalez said, "I don't know his, like

real name like that."  CORREA said, "Nah?"  Gonzalez said, "Nah.  I think they call that nigga

Kiki.  I don't know his real name."  CORREA then stated, "Hell, they stole another box from

me, bro."  Gonzalez said, "Oh yeah?"  CORREA said, "Yeah, my nigga."  Gonzalez asked,

"Today?"  CORREA said, "Yeah, bro, today."  Gonzalez said, "Damn, dude.  That's crazy,

Black."  CORREA then stated, "Bullshit.  That shit said out for delivery.  [Unintelligible] my

nigga."  Gonzalez said, "I think that nigga's name was maybe like Jurinski, but I don't know

nigga, like I'm not hundred percent."  CORREA asked, "His name is not Christopher?"

Gonzalez said, "Nah, I don't think so."  CORREA acknowledged.  Gonzalez said, "Yeah, I don't

think so, but damn, that shit's crazy.  Like, alright then."  CORREA said, "If that shit turns, if

that shit um changes from red to blue."

41.     Based on my training and experience, as well as my familiarity with this

investigation, I believe that during this call, CORREA told Gonzalez that a package containing

cocaine had been lost ("they stole another box from me").  I believe that CORREA said that the

package had been marked as "out for delivery" but had not arrived.  I believe that CORREA was referring to the package seized on July 30, 2021.

42.     On August 3, 2021, at approximately 12:52 p.m., agents intercepted a call over Target Telephone #13 during which CORREA spoke with CORREA-DONES, who was using telephone number (939) 539-3991.  During the call, CORREA addressed CORREA-DONES as "Ma," and stated, "Did they tell you already, one of my boxes didn't make it, mommy." CORREA-DONES exclaimed, "No, Joe!"  CORREA affirmed, and CORREA-DONES said, "But the one from whom?"  CORREA said, "The one from Anthony," and CORREA-DONES said, "Yours?"  CORREA affirmed, and CORREA-DONES said, "Oh my goodness!  Where did he send it from?"  CORREA said, "From the new one, mom."  CORREA-DONES asked, "From the same place I sent it from?"  CORREA said, "Yes, but it wasn't there, but it wasn't there, it wasn't over there.  It wasn't over there.  It was brought over here."  CORREA-DONES said, "Oh, shit.  You will have to change the address once again."  CORREA affirmed, and CORREA-DONES said, "I saw a box, Joe, from the same postal service.  It's a bit smaller, but it looks the same."  CORREA said, "Yes, Mommy, we have to change all those boxes.  All the boxes they have over there, we have to bring them."  They discussed box sizes, and CORREA said, "They stole it from me, mommy."  CORREA-DONES said, "They stole it, but which address did you send it to, to your house?"  CORREA said, "No, that one arrived fine.  That one arrived first." CORREA continued, "The one, the one that you sent with Alan, with Miriam and Alan, those were fine."  CORREA-DONES asked, "What about the one for Bebo and Luis, did those arrive?"  CORREA said, "Yes, those arrived.  All of them arrived except one of mine." CORREA-DONES commented that CORREA had bad luck.  CORREA-DONES told CORREA to "continue moving forward."  She said, "Damn, if I knew, I would have sent it to you from

over here." CORREA said, "I don't think it was that. I think it was because I used Sonyi's address a couple of times." CORREA-DONES said, "Ah, that's the one that went to, let me take a look at the address, that way I won't forget." CORREA said, "33 Portland." CORREA-DONES said, "Portland, yes, damn!" CORREA affirmed, and CORREA-DONES asked, "And it was written correctly, right, Joe?" CORREA affirmed. CORREA-DONES told CORREA, "[Y]ou cannot use that address anymore." CORREA agreed, "I cannot use Lawrence any longer, mommy."

43.     Based on my training and experience, as well as my familiarity with this investigation, I believe that during this call, CORREA and CORREA-DONES discussed the seized package containing cocaine. I believe that CORREA told CORREA-DONES that a package sent by his cousin Anthony to 33 Portland Street, Second Floor, Lawrence, which is within the same residential structure as S. ROSARIO's residence and Target Location #3, did not arrive at its destination. I believe that CORREA's mother inquired about numerous other packages containing cocaine that she and their associates had shipped from Puerto Rico to Massachusetts (including a package sent from Miriam Alamo to Maribel Alamo at 34 Coolidge Street, Lawrence, Massachusetts, which is located within the same residential structure as Target Location #1, which had been sent by CORREA-DONES), and that CORREA stated that they all had arrived safely, including the package shipped to his residence. I believe that CORREA and his mother discussed the fact that in the future CORREA would have to ship packages containing drugs to addresses outside of Lawrence.

> On August 20, 2021, Agents Seized 500 Grams of Cocaine from M. ROSARIO After She Obtained It from S. ROSARIO Outside of Target Location #3.

44.     On August 20, 2021, agents intercepted a call during which CORREA asked M. ROSARIO to retrieve an item and bring it to him. Agents conducting surveillance observed M.

ROSARIO arrive at 33 Portland Street in Lawrence, which is the location of Target Location #3, at approximately 5:45 p.m.  S. ROSARIO then exited the front door of 33 Portland Street carrying a white plastic bag.  S. ROSARIO went to the trunk of her car and began to remove items from the trunk of her car.  M. ROSARIO approached S. ROSARIO's car and also began taking items out of S. ROSARIO's trunk.  Both M. ROSARIO and S. ROSARIO then began putting items in the trunk of M. ROSARIO's car.  At approximately 5:47 p.m., M. ROSARIO left 33 Portland Street in her car.  After M. ROSARIO left 33 Portland Street, she was stopped by police.  Police seized approximately half a kilogram of a substance that field tested positive for cocaine from the trunk of M. ROSARIO's car.  M. ROSARIO stated to police that she had no idea how the package seized by police had gotten into her car.

> On October 22, 2021, Agents Obtained a Search Warrant for a Package Mailed on Behalf of J. MARTINEZ to Target Location #9 and Seized 500 Grams of Cocaine.

45.     On October 22, 2021, at approximately 12:05 p.m., agents intercepted a call over Target Telephone #13 during which CORREA spoke with PEREZ FRIAS, who was using telephone number (978) 398-5540.  During the call, CORREA asked, "Did Bebo get that yet?" PEREZ FRIAS said, "No, I'm still here waiting for the mailman."  CORREA asked, "Where is he?  At the Post Office?"  PEREZ FRIAS repeated that he was at home waiting for the mail. CORREA asked, "Still nothing with the mailman?"  PEREZ FRIAS said, "No, he hasn't come by today."  CORREA then asked if the mailman who had delivered the mail the day prior had been PEREZ FRIAS's regular mailman.  PEREZ FRIAS negated, and CORREA said, "So he was the one that stole the box."

46.     On October 22, 2021, agents obtained a search warrant for a package shipped to Jose MARTINEZ at 10 Clarence Terrace, Second Floor, Lawrence, Massachusetts, which is Luis PEREZ FRIAS's residence and Target Location #9.  The package contained half a kilogram of a

substance that field tested positive for cocaine.  Thereafter, J. MARTINEZ called the post office

and went to the post office attempting to obtain the package.

47.     Based on my training and experience, as well as my familiarity with this

investigation, I believe that during the call set forth above, CORREA inquired about the box that

was seized by law enforcement (which was intended for "Bebo," or J. MARTINEZ) and

suggested that it – and its contents – had been stolen by a letter carrier with the Lawrence Post

Office.

> On November 1, 2021, Agents Seized 1.5 Kilograms of Cocaine and $15,751 that
> CORREA Gave to RAMON.

48.     In the days leading up to November 1, 2021, agents intercepted calls showing that

CORREA had traveled to Connecticut to retrieve two kilograms of cocaine.  Interceptions

showed that CORREA was not happy with the quality of the drugs ("They obviously touched it. .

. . I keep selling them like that, fucker, I'm going to lose my people, baby.") and had only been

able to sell 600 grams of drugs ("do you have the whole one, and half?"  "And four").  On

November 1, 2021, CORREA arranged to deliver the remaining 1.4 kilograms of cocaine to a

worker for the associate who had originally supplied the cocaine.  CORREA told the associate,

"I have that in my garage.  I can pick it up at 5:30."[3]  The associate agreed to coordinate with his

worker.  At 5:19 p.m., CORREA was intercepted over Target Telephone #13 telling the

associate, "I'm going to be ready shortly. I'm leaving, like I told you, at 5:30, when the people

from the garage leave, because I can go in the garage.  I'll go in, take that out, and head up

there."

---

[3] CORREA also stated, "You know I never leave that in my house, baby.  I'm heated."
Based on intercepted communications and surveillance observations, as set forth in part herein, I
do not credit CORREA's statement that he never leaves drugs in his house.

49.     At approximately 7:04 p.m. that night, agents observed CORREA and Luis

Aponte leave 190 Carleton Street and drive to All American Self Storage in Methuen,

Massachusetts, which is where Target Location #2 is located.  Based on pole camera

surveillance, CORREA drove into the storage facility and parked in front of a storage unit.  He

then exited the driver's seat, opened the trunk of the car, and opened the door to the storage unit.

CORREA entered the storage unit bay.  After a few minutes, he exited the storage unit holding a

large box-type object, which he placed in the trunk of his car.  Moments later, CORREA

removed the box-type object from the trunk and returned it to the storage unit.  He then closed

the storage unit, closed the trunk, got back into the driver's seat, and left the storage facility.

50.     Based on my training and experience, as well as my familiarity with this

investigation, I believe that CORREA retrieved approximately 1.5 kilograms of cocaine from the

storage unit and placed them in his car.

51.     Agents conducted surveillance of CORREA and Aponte as they traveled to

Connecticut and met with RAMON inside of RAMON's car at approximately 10:00 p.m. in the

parking lot of a Home Depot in North Windham.  After they parted ways, RAMON was stopped

by a Connecticut State Police unit, and approximately 1.5 kilograms of a substance that field

tested positive for cocaine were seized from a hidden compartment in his vehicle.  Police also

seized $15,751 from a fanny pack in the vehicle.  RAMON was arrested on Connecticut state

charges.  CORREA was intercepted telling an associate about the arrest the following day.

52.     Based on my training and experience, as well as my familiarity with this

investigation, I believe that CORREA traveled to Connecticut to return the 1.5 kilograms of

cocaine to RAMON – who was working as a courier for CORREA's drug supplier – and to pay

for the half kilogram of cocaine that he had distributed.  I believe that the drugs and money seized from the hidden compartment in RAMON's car had been given to him by CORREA.

> On November 9, 2021, Agents Seized 500 Grams of Fentanyl, 125 Grams of Cocaine, and Suboxone from WILL While He Was en Route to Deliver Drugs to EATON.

53.     On November 9, 2021, at approximately 1:04 p.m., agents intercepted a call over Target Telephone #18 during which WILL spoke with DEJESUS, who was using telephone number (617) 866-1445.  During the call, which lasted eighteen minutes, WILL stated, "This nigga, Cloud, Cloud, Cloud, um Cloud hit me saying, 'Pull up tonight.'  So Imma have to, Imma have to move, buy the, buy the, um.  Imma have to go buy the joints."  DEJESUS asked, "The cut?" and WILL said, "Yeah.  Yeah.  Imma have to go buy the, the shit.  I already got the joint at the crib."

54.     At approximately 8:30 p.m. that night, agents intercepted another call over Target Telephone #18 during which WILL spoke with DEJESUS, who was using telephone number (617) 866-1445.  During the call, which lasted eleven minutes, WILL said, "Oh, man, nigga, that shit was, uh, shit got fucking, fucked up off that shit, that shit."  DEJESUS asked, "Of what, nigga?" WILL said, "The one that, I just finish to having to get that shit ready."  DEJESUS asked, "What?" and WILL replied, "This shit for Cloud."  DEJESUS said, "Get the fuck outta here."  WILL said, "Yeah, I'm boutta go see him at ten, nigga.  That shit was, oh my [unintelligible]."  DEJESUS said, "Oh, but you should've put a mask, nigga."  WILL said, "I did.  I put a shirt, nigga.  But, nigga."  DEJESUS asked, "That shit fucked your shit up?"  WILL replied, "Oh my God!  That shit had me, nigga, sweating.  Swearing over there, nigga."  WILL then stated, "But listen, I just called him and tell him I was ready, and then called me right back, talking about, he was like, 'Yo, bro.  Nigga, I don't know if you can, nigga, but last, my last seventeen hundred dollars, you think I can get some of the, of the other?'  I'm like, 'The best I

23

can do for that is fifty, you know?  At thirty-four, you know, seventeen.  That's what I told him.
And I got it, I could get it from Brian.  That one, two twenty-five off of that after everything
count.'"  DEJESUS said, "Yeah, that's cool."  WILL then confirmed that he had already bagged
everything up.  Later, DEJESUS told WILL that he sounded "fucked up" and like he was "boutta
faint."  They then discussed that WILL had not worn a mask but had done it "with a shirt."
DEJESUS asked, "So, what you did?  You did the four hundred?"  WILL affirmed, "Yeah, I put,
I threw a hundred on four hundred."  Later, DEJESUS again chided WILL for not wearing a
mask, saying, "I'm not even playing, you can get an overdose, nigga."

55.     Based on my training and experience, I believe that during these calls, WILL and
DEJESUS discussed the fact that WILL was going to deliver drugs to EATON ("Cloud").[4]  I
believe that WILL initially told DEJESUS that he had the drugs ("the joint") but needed to
obtain cutting agent to dilute the drugs ("cut").  I believe that WILL then reported to DEJESUS
that he had diluted 400 grams of fentanyl with 100 grams of cutting agent ("threw a hundred on
four hundred").  I believe that WILL stated that he had not worn a mask while diluting the
fentanyl but had wrapped a shirt around his face.  I believe that WILL stated that he had inhaled
some of the fentanyl while diluting it, and that he had felt sick as a result.  I believe that
DEJESUS told WILL that he needed to be more careful when working with fentanyl because he
could overdose if he inhaled the drugs.

56.     That night, at approximately 10:35 p.m., WILL was stopped while driving on
Route 2 in Harvard, Massachusetts.  His girlfriend, Emily Ramos, was in the car with him.  A
narcotic-trained canine alerted to the car, which was towed to the State Police barracks.  At the
barracks, agents located a hidden compartment in the back of the front passenger seat of the car.

---

[4] As set forth below, Cloud was identified as EATON based on voice comparison.

Inside the hidden compartment, agents found approximately 500 grams of light brown powder that field tested positive for fentanyl or methamphetamine.  Based on my training and experience, and my familiarity with this investigation, I believe the powder is fentanyl.  Inside the hidden compartment, agents also located approximately 50 grams of a white compressed powder that field tested positive for cocaine.  I believe this fentanyl and cocaine were intended for EATON.  Agents also located additional cocaine, packaged in street-level distribution quantities, pills, and sublingual suboxone in the hidden compartment.  WILL was not arrested at that time.

57.     Thereafter, WILL was intercepted telling DEJESUS about the car stop. DEJESUS expressed displeasure with WILL and stated that he was the one who was "fucked over."  DEJESUS further stated that he had not yet paid.

On November 11, 2021, Investigators Seized Fentanyl, Cocaine, and Suboxone from SANCHEZ as He Attempted to Take It into Middleton House of Correction for DEJESUS.

58.     In the days leading up to November 11, 2021, agents intercepted calls over Target Telephone #18 during which WILL and DEJESUS discussed a Correctional Officer who had helped DEJESUS obtain his cellphone and who was going to take a package containing contraband to DEJESUS in the jail.  DEJESUS instructed WILL as to what to put in the package, how to wrap the package, and what to pay the Correctional Officer, who was ultimately identified as SANCHEZ.

59.     For example, on November 10, 2021, at approximately 5:14 p.m., agents intercepted a call over Target Telephone #18 during which WILL spoke with DEJESUS.  During the call, which lasted 39 minutes, DEJESUS gave WILL instructions as to what to put in the package he would receive.  DEJESUS said, "Yeah, yeah, yeah, grab the chip, nigga, and tells

Pops Dukes, let me know when you're at Pop Dukes, Imma need a few balls and a few sixties, nigga." WILL said, "Yeah, yeah, yeah. Tell him. Tell him." DEJESUS then explained, "You feel me? Imma need like three balls, three sixties, nigga. Since, nigga, since we're missing the other a hundred forty, nigga. Cool, black. You understand me? I just save those for the next trip." WILL acknowledged. WILL stated that when he got the "SUV," he would have "a hundred and something more stippies." WILL later stated that he was thinking of "putting two hundred blues . . . ." During the call, WILL called Felipe MARTINEZ on another phone in the background and told him that he needed "at least three big ones and like, three cocolos." DEJESUS then repeated, "Listen, three of the big ones and three cocolos . . . ." DEJESUS and MARTINEZ then talked to one another through WILL's two phones, and DEJESUS instructed MARTINEZ to "give it to WILL" that day. DEJESUS told MARTINEZ, "So, then, the guy, I'm going to give the guy your number, so you can see him in the afternoon. But WILL is going to give you the stuff tomorrow, whatever it is." MARTINEZ asked, "So, how much I have to give him then?" and DEJESUS said, "Six thousand bucks. WILL is going to give him three thousand, and you'll put three thousand." DEJESUS later instructed WILL to use "black tape" to "do this pack." Later in the call, WILL stated that he could "probably fit three hundred blues" and later repeated that he was going to put "three hundred pills" with the "three balls."

60.     Based on my training and experience, as well as my familiarity with this investigation, I believe that during this call, DEJESUS, WILL, and MARTINEZ discussed the package that SANCHEZ was going to take into the jail for DEJESUS and the payment that SANCHEZ would receive for doing so. I believe that DEJESUS stated that he wanted to receive three eighth-ounces of cocaine ("balls") and three smaller quantities of cocaine ("sixties"). I believe that he and WILL also discussed including 300 fentanyl pills ("blues") in the package, as

26

well as a SIM card for a cellphone ("chip"). I believe that WILL stated that once he was able to

collect his car from the police, he would have suboxone sublingual strips ("stippies") to send to

DEJESUS, as well. I believe that DEJESUS instructed WILL to wrap the package with black

tape. I also believe that DEJESUS stated that WILL and MARTINEZ would each contribute

$3,000, to pay SANCHEZ a total of $6,000.

61.     At approximately 6:57 p.m. that night, agents intercepted another call over Target

Telephone #18 during which WILL spoke to DEJESUS. During the call, DEJESUS told WILL

that "Dabo" had "250 blues" for him. WILL stated that was "perfect." DEJESUS later told

WILL, "The nigga said that tomorrow at 7:00, he's gonna, he's gonna pick that shit up."

DEJESUS proceeded to talk about how much profit he could make off the contents of the

package.

62.     Based on my training and experience, I believe that during this call, DEJESUS

told WILL that Darwin Hernandez a/k/a "Dabo" had 250 pills ("blues") for WILL to put in the

package he was sending to DEJESUS. I further believe that DEJESUS stated that SANCHEZ

would retrieve the package from MARTINEZ at 7:00 p.m. the following day.

63.     At approximately 8:47 p.m. that night, agents intercepted a call over Target

Telephone #18 during which Dabo spoke with WILL. During the call, Dabo said, "What's up,

man? Come to my house." WILL said, "I gotchu. I'm just gonna go a little bit closer, which

it's time for me to leave. You heard?" Dabo expressed frustration, saying he needed to leave.

WILL said, "So, Imma pull up. I'll be right there."

64.     At approximately 9:23 p.m., agents intercepted a call over Target Telephone #18

during which WILL told Dabo, "I'm outside."

65.     Simultaneously, at approximately 9:23 p.m., a pole camera outside of Dabo's residence at 46 Tewksbury Street in Lawrence, Massachusetts, showed a four-door sedan arriving outside of the residence.  The four-door sedan parked in the driveway of the residence. Due to lighting conditions, agents were not able to observe whether anyone entered or exited 46 Tewksbury Street.  The four-door sedan departed at approximately 9:27 p.m.  Based on my familiarity with this investigation, I believe that WILL traveled to Dabo's residence to obtain the 250 pills for DEJESUS.

66.     That night, WILL and DEJESUS were intercepted continuing to discuss the contents of the package that WILL was preparing for DEJESUS and the manner in which it was assembled.  Based on the interceptions, WILL was sending DEJESUS images over Snapchat, an application that allows users to exchange images.

67.     The following day, November 11, 2021, at approximately 2:29 p.m., agents intercepted a call over Target Telephone #18 during which WILL told DEJESUS that he had given "the package" to "Pop Dukes," which I understand to be a reference to MARTINEZ. WILL confirmed that he had told MARTINEZ that "niggas was gonna call at seven."  WILL told DEJESUS that he had told MARTINEZ about "the strips and the white," but not "about the blue."  DEJESUS told WILL, "I want you to be there, black.  I want you to be the one."  Based on my training and experience, I believe that during this call, WILL told DEJESUS that he had given the package for SANCHEZ to MARTINEZ, and that MARTINEZ was aware that there was cocaine ("white") and suboxone ("strips") in the package, but not that the package contained pills ("blue").  I believe that DEJESUS stated that he wanted WILL to give the package to SANCHEZ.

68.     At approximately 6:24 p.m., agents conducting surveillance observed MARTINEZ meet with SANCHEZ outside of Primo's Liquors at Morton and Haverhill Streets in Lawrence, Massachusetts.  Agents observed MARTINEZ approach and enter the passenger side of a red Honda CR-V driven by SANCHEZ.  MARTINEZ remained inside the vehicle for approximately five minutes.  He then exited the CR-V, which left the area.  MARTINEZ departed on foot.  Thereafter, agents intercepted calls between DEJESUS and WILL over Target Telephone #18 during which they discussed the fact that MARTINEZ had met with "the nigga" by himself.

69.     That night, when SANCHEZ reported to Middleton House of Correction for his shift, he was questioned by Internal Affairs personnel at the jail.  SANCHEZ turned over a heavily taped object that he was carrying in his pocket.  The taped object contained seven bags (some of which were consistent with "eight-balls" and some of which were smaller) of white powder that field tested positive for cocaine, blue pills believed to contain fentanyl, a field test of which was inconclusive, and suboxone sublingual strips, along with a SIM card for a cellular telephone.  The taped object and its contents were consistent with calls intercepted between DEJESUS and WILL over Target Telephone #18.  SANCHEZ was cooperative, but Internal Affairs personnel did not ask him any questions.  He was not arrested but was placed on administrative leave.

   On November 24, 2021, Investigators Obtained a Search Warrant for a Package Mailed to L. MARTINEZ's New Hampshire Residence and Seized 500 Grams of Cocaine.

70.     Prior to November 24, 2021, investigators identified a package that had been mailed from Puerto Rico to Ashley Abreu at 281 Auburn Street, third floor, Manchester, New Hampshire.  Agents obtained a search warrant for the package on November 24, 2021.  The package contained approximately 500 grams of a substance that field tested positive for cocaine.

As set forth below, based on physical surveillance and intercepted communications, I am aware that L. MARTINEZ resides part-time at 281 Auburn Street, Manchester, New Hampshire, and that he maintains a drug stash for CORREA there.

> On November 30, 2021, Investigators Seized Approximately 160 Grams of Suspected Fentanyl from GUERRERO VALDEZ.

71.     On November 29, 2021, at approximately 4:38 p.m., agents intercepted a call over Target Telephone #19 during which CORREA spoke with GUERRERO VALDEZ.  During the call, CORREA asked GUERRERO VALDEZ, "What's up," and GUERRERO VALDEZ replied, "I'm super far right now, dude."  GUERRERO VALDEZ then clarified, "I'm in New York, dude.  I'll head over there in a little bit."  CORREA said, "No, it's cool.  If you are in New York, and you're there getting something that's really good--."  GUERRERO VALDEZ said, "No, of course."  CORREA said, "We're, we're ready.  I haven't worked for two or three days, Duro."  GUERRERO VALDEZ asked, "But why?  What's happening?  It's slow?"  CORREA chuckled and said, "What do you mean?  You know, if there's no rhythm, Duro, you know that it's slow.  You kind of, you kind of know."  GUERRERO VALDEZ said, "Got it."  CORREA then said, "But go ahead.  The thing is that my son was born, too.  I have like three without anything.  Let me know when you have something really good, you heard?"  GUERRERO VALDEZ said, "Alright, alright.  I'll let you know when I'm heading up there.  It'll be for tomorrow, you know?  Because I'll be arriving late and tired."  CORREA said, "For tomorrow?  So then, tomorrow it is."  GUERRERO VALDEZ agreed.

72.     Based on my training and experience, as well as my familiarity with this investigation, I believe that during this call, GUERRERO VALDEZ told CORREA that he was in New York obtaining drugs ("getting something that's really good").  I believe that CORREA stated that he had not distributed many drugs over the past few days because he had not obtained

drugs from GUERRERO VALDEZ ("when there's no rhythm, Duro, you know that it's slow"). I believe that CORREA asked GUERRERO VALDEZ to tell him when GUERRERO VALDEZ had obtained high-quality drugs ("Let me know when you have something really good"). I believe that GUERRERO VALDEZ stated that he would tell CORREA when he was returning from New York and ultimately agreed to deliver the drugs the following day ("So then, tomorrow it is").[5]

73.     On November 30, 2021, at approximately 7:29 a.m., CORREA sent an intercepted text message from Target Telephone #19 to GUERRERO VALDEZ that said, "At what time I see you?"  At approximately 9:07 a.m., GUERRERO VALDEZ called CORREA.  The call was intercepted over Target Telephone #19.  During the call, GUERRERO VALDEZ said he would arrive at CORREA's location in forty minutes.  CORREA said it would be better to meet in an hour.  GUERRERO VALDEZ asked, "Will you want the same?"  CORREA said, "Seven.  No.  I want thirty-five and a little more of curtain."  GUERRERO VALDEZ acknowledged, and

---

[5] On November 29, 2021, at approximately 7:21 p.m., agents intercepted a call over Target Telephone #19 during which CORREA spoke with a male identified only as "Jose," who was using telephone number (351) 353-0286.  During the call, Jose asked if he could "visit" CORREA.  CORREA said, "Damn, bro, not until tomorrow.  There's nothing.  It's n-, I don't have anything from either of the two."  Jose asked, "Tomorrow at what time?" and CORREA stated, "Well, if you want both, both after twelve, Jose.  Because Duro, which is the chocolate, which I don't have any, any, any, anything of.  He's in New York, and he's coming over today [unintelligible].  He gonna see me tomorrow in the morning.  And the other one for like one around there, so after twelve, I'll be ready with both of them."  Jose said, "Well, everything's set."  CORREA stated that it was "guaranteed to arrive," and when Jose began to ask a question, CORREA said, "The chocolates.  I complained to him again, so that is coming, buddy.  You'll see, buddy."

Based on my training and experience, as well as my familiarity with this investigation, I believe that during this call, Jose inquired about obtaining drugs from CORREA.  I believe that CORREA stated that he did not have fentanyl or cocaine ("either of the two") but would have more drugs the following day.  I believe that CORREA reported that GUERRERO VALDEZ was in New York but would deliver fentanyl ("chocolate") the following day in the morning.  I believe that CORREA said he had complained to GUERRERO VALDEZ about not receiving drugs and that he was sure the drugs would arrive.

CORREA corrected himself, "Listen, thirty-seven, excuse me.  Because it is five for a buddy of

mine, and two for Soplo.  Thirty-seven, buddy."  GUERRERO VALDEZ agreed, and CORREA

then began to complain about the quality of the drugs he had received from GUERRERO

VALDEZ.  GUERRERO VALDEZ said that he would "check the cut" and "check the curtain."

They then agreed to talk later so that GUERRERO VALDEZ could take CORREA "that."

74.     Based on my training and experience, as well as my familiarity with this

investigation, I believe that during this call, CORREA asked GUERRERO VALDEZ to deliver

thirty-seven grams of fentanyl ("thirty-seven") to him.  I believe that when CORREA

complained about the quality of the drugs, GUERRERO VALDEZ said that he would check the

dilutant mixed with the drugs to ensure that CORREA's customers were happy with the drugs.

75.     At approximately 11:12 a.m. that morning, agents intercepted a call over Target

Telephone #19 during which CORREA spoke with GUERRERO VALDEZ.  During the call,

CORREA said, "Bring me three.  Bring me three ten of [unintelligible] and thirty-seven."

GUERRERO VALDEZ asked for clarification, and CORREA said, "Thirty-seven of the good

ones.  And, and, and three hundred ten of the curtain."  GUERRERO VALDEZ agreed.

76.     Based on my training and experience, as well as my familiarity with this

investigation, I believe that during this call, CORREA asked GUERRERO VALDEZ to deliver

thirty-seven grams of fentanyl ("the good ones") and 310 grams of cutting agent ("curtain") to

him.

77.     At approximately 11:25 a.m. that morning, I was conducting surveillance and

observed GUERRERO VALDEZ exit the side door of 283 Howard Street, Lawrence,

Massachusetts, carrying a purple laundry bag.  GUERRERO VALDEZ then walked behind the

house, out of my view.  Moments later, I observed a black 2008 Honda CR-V with

Massachusetts Registration 2KGT79 and vehicle identification number ("VIN")

JHLRE48538C026668, registered to Fauris GUERRERO VALDEZ, 283 Howard Street,

Apartment 2, Lawrence, Massachusetts (hereinafter, the "CR-V"), back out of the driveway of

283 Howard Street.  GUERRERO VALDEZ was the driver of the car.  Agents followed

GUERRERO VALDEZ as he drove to the south side of Lawrence.

78.    While he was still under surveillance, GUERRERO VALDEZ was stopped by a

marked Lawrence Police unit on Dracut Street between South Broadway and Brookfield Street.

The Lawrence Police Officer approached the driver's window of the CR-V.  GUERRERO

VALDEZ was operating the car and was alone.  The Police Officer observed a bulge in

GUERRERO VALDEZ's waistband.  At that time, the Police Officer inquired as to whether

GUERRERO VALDEZ had any weapons, and he negated.  The Police Officer requested that

GUERRERO VALDEZ exit the vehicle, which he did. The Police Officer then touched the bulge

at GUERRERO VALDEZ's waist and asked what it was.  GUERRERO VALDEZ did not

answer.  Based on his training and experience and his knowledge of the investigation, the Officer

immediately recognized the bulge to feel like a bag of powder consistent with drugs.  At that

time, the Officer removed a plastic bag containing tan powder and smaller bags of a white

compressed powder substance from GUERRERO VALDEZ's waistband.

79.    The white powder was tested using a TruNarc device.  It tested positive for

acetaminophen, which I know to be Tylenol.  I am aware that fentanyl sometimes field tests

positive for acetaminophen.  Based on the intercepted calls, my training and experience, the fact

that GUERRERO VALDEZ was in possession of quantities of two types of powder, the

appearance and packaging of the powder, and the manner in which it was concealed, I believe

that the compressed white powder is fentanyl.

80.     GUERRERO VALDEZ was arrested, and police seized two telephones from the CR-V.  The CR-V was towed from the scene.  After GUERRERO VALDEZ was arrested and the car was towed, one of the telephones seized from the CR-V began to ring.  The name "Duro" displayed on the screen.  Pen register data for Target Telephone #19 showed that CORREA was making a call to "Duro" at that time.  Based on my training and experience, I believe that GUERRERO VALDEZ is "Duro," and that he left 283 Howard Street with fentanyl intended for CORREA.

81.     That evening, investigators obtained a search warrant for 283 Howard Street, Apartment 2, Lawrence, Massachusetts, which is the listed address on GUERRERO VALDEZ's Massachusetts driver's license and the address to which the CR-V is registered.  From a box in the drop ceiling of a bedroom of the apartment, agents seized approximately 126 grams of a substance that field tested positive for fentanyl.  Agents also seized cutting agent, a digital scale, and identification and other documents in GUERRERO VALDEZ's name from the same bedroom of the apartment as the drugs.

### On December 8, 2021, Agents Seized One Kilogram of Cocaine from HERNANDEZ MERCEDES.

82.     On December 8, 2021, at approximately 7:27 p.m., agents intercepted a call over Target Telephone #12 during which REYES spoke with MARTINEZ.  During the call, MARTINEZ and REYES discussed how their families were doing.  MARTINEZ then said he would call right back.

83.     Immediately thereafter, at approximately 7:31 p.m., REYES used Target Telephone #12 to call Target Telephone #14.  During the call, REYES stated, "Go to the bald-headed guy's place."  HERNANDEZ MERCEDES sighed and said, "For what?"  REYES said,

"Um, bring him the change."  The Courier said, "Huh?" and REYES said, "Bring one to him."
HERNANDEZ MERCEDES agreed.

84.     At approximately 7:32 p.m., MARTINEZ again called REYES at Target
Telephone #12.  During the call, MARTINEZ asked, "Where are we at?"  REYES said, "Mmm,
fourteen-six."  MARTINEZ said he couldn't remember.  MARTINEZ then stated, "No, but I
remember, I know it was with the three, right?  When you sent--."  REYES said, "Mmhmm."
MARTINEZ then said, "Was it two or three that I told them to send me?"  REYES said, "Um,
two."  MARTINEZ said, "Oh, two.  Yeah, yeah, yeah, yeah.  That's fine."

85.     Based on my training and experience, I believe that REYES told HERNANDEZ
MERCEDES to deliver one kilogram of cocaine to MARTINEZ ("the bald-headed guy").  I
believe that MARTINEZ asked REYES how much money he owed to him, and that REYES said
that MARTINEZ owed him $14,600 ("fourteen-six").  I believe that MARTINEZ then asked
whether REYES had previously sent him two or three kilograms of drugs, and REYES said it
had been two.

86.     At approximately 8:11 p.m. on December 8, 2021, agents observed a black Honda
CR-V with Massachusetts registration 2YSD78, registered to HERNANDEZ MERCEDES at 26
Arlington Street, Lawrence, Massachusetts (the "HERNANDEZ MERCEDES CR-V"), arrive in the
area of 311 Water Street, Lawrence, and park on the street across from the building.[6]  The driver
entered 311 Water Street via the front door.  At approximately 8:16 p.m., agents observed the
driver exit the front door of 311 Water Street, enter the HERNANDEZ MERCEDES CR-V, and
pull onto the street.  The CR-V was stopped by police a short distance away for speeding.  The
officer who stopped the car observed the driver, who was subsequently identified as

---

[6] Agents had observed the user of Target Telephone #14 using the HERNANDEZ
MERCEDES CR-V to deliver drugs on previous occasions, as set forth in part herein below.

HERNANDEZ MERCEDES, leaning into the front passenger seat as he stopped the car.  When the officer approached the car and requested HERNANEZ MERCEDES's driver's license, HERNANDEZ MERCEDES immediately exited the car.  The officer and HERNANDEZ MERCEDES then moved to the back of the car, where the officer asked for and obtained consent to search the HERNANDEZ MERCEDES CR-V.  The officer recovered a brick of cellophane-wrapped compressed powder from underneath the front passenger seat of the car.  The powder field tested positive with a TruNarc device for cocaine and weighed approximately 1,000 grams.  Agents also seized two cellphones from the HERNANDEZ MERCEDES CR-V.  When agents dialed the number for Target Telephone #14, one of the phones seized from the car rang.

87.     Thereafter, agents obtained search warrants for MERCEDES HERNANDEZ's and REYES's residences.  From MERCEDES HERNANDEZ's apartment (311 Water Street, Apartment 13, Lawrence, Massachusetts), agents seized a kilogram press, green cellophane commonly used to package drugs for distribution, suspected cutting agent for diluting cocaine, approximately $10,000, and documents in MERCEDES HERNANDEZ's name.  From REYES's apartment (50 Tewksbury Street, First Floor, Lawrence, Massachusetts), agents seized approximately $100,000, a cellular telephone that rang when agents dialed the number for Target Telephone #12, and documents in REYES's name.

<u>Relationships Between the Target Subjects</u>

88.     Intercepted communications, together with physical and electronic surveillance, have allowed investigators to understand the relationships between the Target Subjects.  These relationships are described below.

CORREA-J. MARTINEZ-L. MARTINEZ-CORREA-DONES

89.     Based on government records and intercepted calls, I believe that CORREA, J. MARTINEZ, and L. MARTINEZ are half-brothers.  I further believe that CORREA-DONES is their mother.  I believe that CORREA, J. MARTINEZ, and L. MARTINEZ live in Massachusetts and New Hampshire, and that CORREA-DONES resides in Puerto Rico.  During the course of the investigation, agents have learned that CORREA, J. MARTINEZ, and L. MARTINEZ obtain cocaine in Puerto Rico and ship the drugs – or have the drugs shipped – to locations in Massachusetts, New York, and New Hampshire.  Agents have learned that CORREA-DONES mails packages containing drugs on behalf of her sons, CORREA, J. MARTINEZ, and L. MARTINEZ.  As set forth in paragraphs 35 and 42 above, CORREA-DONES has been observed mailing packages found to contain cocaine and has been intercepted discussing packages she has mailed for her sons.

90.     Agents have learned that J. MARTINEZ distributes drugs in and around Lawrence.  Agents also have learned that L. MARTINEZ assists CORREA with distributing drugs and currently maintains a drug stash location at his residence at 281 Auburn Street, Second Floor, in Manchester, New Hampshire.

*On June 14-15, 2021, L. MARTINEZ Made Drug Deliveries for CORREA.*

91.     On June 14, 2021, at approximately 8:25 p.m., agents intercepted a call over Target Telephone #10 during which CORREA spoke with L. MARTINEZ.  During the call, CORREA asked, "What's left?"  L. MARTINEZ asked for clarification, and CORREA said, "How much do you have left?"  L. MARTINEZ said, "Not a lot.  I still have coco.  I think, like, I think like three, I think, three or four."  CORREA then asked, "Chocolate?"  L. MARTINEZ answered, "Chocolate, I think I have about three or four."  CORREA said, "Alright," and then

instructed, "Before the night is over, pass by here.  I have to give you three and a half for the guy."  L. MARTINEZ agreed.

92.     Based on my training and experience, as well as my familiarity with this investigation, I believe that during this call, CORREA inquired with L. MARTINEZ about the quantities of drugs that L. MARTINEZ had with him.  I believe that L. MARTINEZ told CORREA that he had "three or four" of cocaine ("coco") available.  I believe that CORREA then asked about heroin or fentanyl ("Chocolate"), and that L. MARTINEZ stated that he had "three or four" of that, as well.  I believe that L. MARTINEZ is working as a courier or "runner" for CORREA, and that CORREA instructed L. MARTINEZ to stop by CORREA's location so that CORREA could provide him with "three and a half" of a particular drug for a drug customer ("the guy").  Based on pole camera surveillance, at approximately 9:05 p.m., a Hispanic male arrived at 190 Carleton Street, Lawrence, Massachusetts, which is where Target Location #1 is located and is where CORREA was and is residing.  Agents intercepted a call over Target Telephone #10 during which L. MARTINEZ told CORREA to open the door.  The Hispanic male then went inside.  I believe that L. MARTINEZ was at CORREA's location to pick up the drugs for "the guy."

93.     On June 15, 2021, at approximately 6:18 p.m., agents intercepted a call over Target Telephone #10 during which CORREA spoke with L. MARTINEZ.  During the call, CORREA asked, "Do you have two?"  L. MARTINEZ asked, "Two what?"  CORREA replied, "Chocolate."  L. MARTINEZ affirmed, and CORREA said, "That's for Gordo."  L. MARTINEZ asked, "Where is he?"  CORREA said, "For Mike's, for Mike's cousin."  L. MARTINEZ again asked, "Where is he?"  CORREA said, "Huh?" and L. MARTINEZ again said, "Where is he?  If

not, just send him to Mount Vernon.  You know?"  CORREA said, "I already sent him there."  L. MARTINEZ agreed.

94.     Based on my training and experience, as well as my familiarity with this investigation, I believe that during this call, CORREA asked if L. MARTINEZ had "two" of heroin or fentanyl ("Chocolate"), and that when L. MARTINEZ affirmed, CORREA stated that the drugs were for a customer known as "Gordo."  I believe that L. MARTINEZ asked for Gordo's location, so that he could deliver the drugs.  I believe that L. MARTINEZ stated that Gordo should, in the alternative, go to L. MARTINEZ's location ("Mount Vernon") to obtain the drugs.  I believe that "Mount Vernon" was a reference to 244 Mount Vernon Street, Apartment 5, Lawrence, which his L. MARTINEZ's Massachusetts residence and is Target Location #6.

95.     On June 15, 2021, at approximately 6:42 p.m., agents intercepted a call over Target Telephone #10 during which CORREA spoke with L. MARTINEZ.  During the call, CORREA asked, "Do you have another three and a half on you?"  L. MARTINEZ affirmed, and CORREA said, "Take it to Jackie."  L. MARTINEZ asked, "Where is she?" and CORREA said, "Let me see where I'm going to send her.  I'll call you back."  L. MARTINEZ agreed.  Two minutes later, CORREA again called L. MARTINEZ.  The call was intercepted over Target Telephone #10.  During the call, CORREA said, "She's cleaning her car there, at the gas station in the South, by where you live."  L. MARTINEZ acknowledged, said he would go then, and asked, "Is it just that?"  CORREA affirmed and said, "Two hundred."  L. MARTINEZ agreed.

96.     Based on my training and experience, as well as my familiarity with this investigation, I believe that during these calls, CORREA directed L. MARTINEZ to distribute three and a half grams ("three and a half") of cocaine to Jackie at a gas station for $200 ("Two hundred").  I believe that L. MARTINEZ agreed to make the delivery.

*On June 16, 2021, J. MARTINEZ Arranged to Distribute Drugs to Customers.*

97.     On June 16, 2021, at approximately 5:22 p.m., agents intercepted a call over Target Telephone #11 during which J. MARTINEZ spoke with a female identified only as "Ashley," who regularly orders drugs from CORREA.  During the call, Ashley stated, "Give me a finger."  J. MARTINEZ said, "What?" and Ashley said, "A finger."  J. MARTINEZ said, "Alright, then.  I have to call these people.  I'm going to call these people and see if they can take it to you."  Ashley said, "Well, I'm right here in Gordo's house, but he's not even here."  J. MARTINEZ said, "No, he's not working, ma."  J. MARTINEZ said he would call Ashley back.

98.     Based on my training and experience, as well as my familiarity with this investigation, I believe that during this call, Ashley requested to purchase ten grams of heroin or fentanyl ("a finger").  I believe that J. MARTINEZ stated that he would call his associates to see if they could deliver the drugs.  I believe that Ashley stated that she was at CORREA's or MARRERO's residence ("Gordo's house"), and that J. MARTINEZ clarified that CORREA or MARRERO was not distributing drugs that day.

99.     That night, at approximately 9:25 p.m., agents intercepted a call over Target Telephone #11 during which J. MARTINEZ spoke with an unidentified male using telephone number (978) 885-8693 ("UM8693").  During the call, UM8693 asked, "Yo, can I come down?"  J. MARTINEZ asked, "What you need, some more?"  UM8693 said, "Huh?" and J. MARTINEZ asked, "What were you in need of?"  UM8693 said, "Uh, the same."  J. MARTINEZ then said, "A'right.  Let me call you back."  At 9:47 p.m., agents intercepted another call between J. MARTINEZ, who was using Target Telephone #11, and UM8693.  During the call, J. MARTINEZ stated that he was going to his "brother's house," and that he thought his brother

"do got it."  They then discussed where to meet, and J. MARTINEZ instructed UM8693 to call

him back when he was ready to meet.

100.    Based on my training and experience, as well as my familiarity with this

investigation, I believe that during this call, J. MARTINEZ agreed to distribute a quantity of

drugs ("the same") to UM8693 after obtaining the drugs from CORREA's residence ("brother's

house").

*On June 17, 2021, J. MARTINEZ and CORREA Spoke About Sending Cocaine from Puerto Rico to Massachusetts.*

101.    On June 17, 2021, at approximately 5:12 p.m., agents intercepted a call over

Target Telephone #11 during which J. MARTINEZ spoke with CORREA, who was using Target

Telephone #13.  During the call, J. MARTINEZ stated that they were leaving the following day,

and that by the same time the next day, they would be "flying" and "traveling."  J. MARTINEZ

then said, "So, nothing here.  This dumbass just called me asking for a halfie of perico, but I told

him that there's none."  CORREA asked who had called, and J. MARTINEZ said, "Um,

Boogie."  J. MARTINEZ related what "Boogie" had said, and CORREA said, "That's what I'm

saying, bro.  That's why I'm telling you, bro.  After you make it through at least two more times,

if, if I buy, if the next time I buy a whole one, and you buy it with Luis, or however you go, we'll

still buy some, because if I tell Felix to sell to us a half, he will sell to us a half."  J. MARTINEZ

later said, "No, but if we make it through, we'll sell it big, bro, fast, like at thirty-two.  If we can,

at thirty-two, we'll sell it at thirty-two."  CORREA agreed, "I know.  I can sell it at thirty-two."

J. MARTINEZ then said, "I know you will, bro.  At thirty-two.  If not, we can call a couple of

people, too.  'At thirty-three.  I have it at thirty-three.  What's up?  At thirty-two, my brother.'"

CORREA agreed and said, "I will tell Richie, 'Buddy, the lowest that I can do is, the lowest,

lowest, if you—'" J. MARTINEZ interrupted, and CORREA then continued, "No, I'll tell him, I

will tell him, 'Buddy, if you want, give me at least thirty-one, thirty one, thirty-one five hundred,' to at least get a thousand five hundred for the tickets." They then discussed charging "thirty-three" or "thirty-two."

102.     Based on my training and experience, as well as my familiarity with this investigation, I believe that during this call, J. MARTINEZ stated that the following day, he and CORREA would be en route to Puerto Rico ("flying"; "traveling"). I believe that J. MARTINEZ then related that a drug customer had called and asked to purchase a quantity ("a halfie") of cocaine ("perico"), but that he had told the customer that he did not have any cocaine. I believe that CORREA then stated that if J. MARTINEZ were able to smuggle cocaine from Puerto Rico to Massachusetts two more times ("After you make it through at least two more times"), he would purchase a kilogram of cocaine ("a whole one") and J. MARTINEZ and L. MARTINEZ ("Luis") could purchase a kilogram of cocaine together ("you buy it with Luis"). I believe that J. MARTINEZ agreed, stating that they would be able to sell the cocaine very quickly ("if we make it through, we'll sell it big, bro, fast"). I believe that J. MARTINEZ and CORREA then discussed charging $32,000 ("thirty-two") or $33,000 ("thirty-three") per kilogram of cocaine. I believe that CORREA stated that he would offer the cocaine to "Richie" for $31,000 or $31,500 per kilogram ("thirty-one"; "thirty-one five hundred") so that he (CORREA) could earn at least $1,500 per kilogram to cover the cost of plane tickets to smuggle the drugs from Puerto Rico to the mainland United States. I am aware that on June 18, 2021, CORREA and J. MARTINEZ flew from Boston, Massachusetts, to San Juan, Puerto Rico. They remained in Puerto Rico until June 21, 2021 (J. MARTINEZ) and June 23, 2021 (CORREA), when they returned to Massachusetts.

*On November 20, 2021, L. MARTINEZ Provided CORREA with Drugs Stored at His New Hampshire Residence.*

103.    On November 20, 2021, at approximately 1:15 p.m., agents intercepted a call over Target Telephone #20 during which CORREA spoke with L. MARTINEZ.  During the call, CORREA asked, "You're home, Luis?"  L. MARTINEZ said, "Yea, I'm still here, man.  I just got up again dude, yeah."  CORREA asked, "And is Soplo there?"  L. MARTINEZ affirmed.  CORREA said, "Tell Soplo I'm down here, bro.  To bring me that stuff, please."  L. MARTINEZ said, "Hold on," and then as an aside, said, "Soplo--."  CORREA said, "Everything, tell him to bring me everything.  The two balls that are there."  L. MARTINEZ then said in the background, "The little balls, the little balls that are there."  L. MARTINEZ then told CORREA, "I'll call you back."

104.    Based on my training and experience, as well as my familiarity with this investigation, I believe that during this call, CORREA asked L. MARTINEZ to have an associate who was at his residence take cocaine ("two balls"; "the little balls that are there") stored at L. MARTINEZ's residence downstairs to CORREA.  I believe that L. MARTINEZ instructed the associate to do so.[7]

*On November 28, 2021, L. MARTINEZ Agreed to Deliver Drugs for CORREA.*

105.    On November 28, 2021, at approximately 6:09 p.m., agents intercepted a call over Target Telephone #20 during which CORREA spoke with a male identified only as "Tyson."  During the call, CORREA said, "Anything you need, let me know.  Luis also has something, and

---

[7] At 11:30 a.m. that morning, agents had intercepted a call over Target Telephone #20 during which L. MARTINEZ told CORREA that he was in his "house over there in New Hampshire."  In a call at 1:16 p.m., CORREA told a person identified only as "Alex" that he was "seeing another person up here, right now, in Manchester."  Based on L. MARTINEZ's saying he was "still here" and on CORREA's statement that he was in Manchester, I believe that during the 1:15 p.m. call, L. MARTINEZ was in New Hampshire, at 281 Auburn Street in Manchester.

he may give you some." Tyson said, "Well, then I'm heading over there. I'm heading over

there! Right now, then. Wrap that up for me." CORREA asked, "You need one? So I can call

him to see if he's near?" Tyson said, "Of course, of course. Fix it up for me. Go ahead."

CORREA said he would call back, and Tyson agreed.

106.    At approximately 6:10 p.m. that night, CORREA used Target Telephone #20 to

call L. MARTINEZ. During the call, which was intercepted, CORREA asked, "Are you in

Lawrence?" L. MARTINEZ said, "Yeah, like fifteen minutes." CORREA said, "Alright. Tyson

wants something." L. MARTINEZ said, "Who?" and CORREA said, "Tyson." L. MARTINEZ

said, "Alright. I don't have that much stuff left. What he wants, three and a half?" CORREA

affirmed. L. MARTINEZ said, "Alright, got it. A'ight. I'll call you back." CORREA said he

would tell Tyson "like twenty-five minutes."

107.    At approximately 6:11 p.m. that night, CORREA used Target Telephone #20 to

call Tyson back. During the call, which was intercepted, CORREA told Tyson, "He said he will

be in Lawrence in five minutes." CORREA then corrected himself and said, "In twenty-five."

Tyson asked CORREA to call him, and CORREA said, "Alright [unintelligible], alright

[unintelligible], in Haverhill, and he will come to you. I, I forgot to tell you yesterday that he

had some, too." Tyson said he would go "wherever he says." CORREA then explained, "But

you know it's not the same. With him, you have to go with the right amount." Tyson said,

"Yeah, no, at one fifty. It's fine. I'm with him. I'm with him there." CORREA agreed.

108.    At approximately 6:34 p.m. that night, agents intercepted a call over Target

Telephone #20 during which CORREA spoke with L. MARTINEZ. During the call, L.

MARTINEZ asked, "Where is he?" CORREA said, "I'm going to send you his number now,"

and L. MARTINEZ agreed.

109.     Based on my training and experience, as well as my familiarity with this investigation, I believe that during this series of calls, Tyson asked to obtain "one" eighth of an ounce of cocaine.  I believe that CORREA stated that L. MARTINEZ ("Luis") had the drugs and would sell them to Tyson.  I believe that CORREA then called L. MARTINEZ and told him that Tyson wanted to purchase the eighth of an ounce (or 3.5 grams) of cocaine ("three and a half").  I believe that L. MARTINEZ agreed to sell the drugs when he returned to Lawrence.  I believe that CORREA then contacted Tyson to tell him that L. MARTINEZ would make the sale and that he (Tyson) needed to pay L. MARTINEZ for the drugs in full at the time he received them ("you have to go with the right amount").  Based on the lack of communication after CORREA stated that he would send L. MARTINEZ Tyson's number, I believe that L. MARTINEZ ultimately made the sale.

> *On December 2, 2021, L. MARTINEZ Discussed Drugs He Was Maintaining for*
> *CORREA at his New Hampshire Residence.*

110.     On December 2, 2021, at approximately 9:28 a.m., agents intercepted a call over Target Telephone #20 during which CORREA spoke to L. MARTINEZ.  During the call, CORREA said, "Set aside, set aside one of the chocolates for me, Luis, please."  L. MARTINEZ said, "Alright, bro."  CORREA said, "I'll be there in two, to go get it.  I'm already on my way there."  L. MARTINEZ replied, "Alright."

111.     Based on my training and experience, as well as my familiarity with this investigation, I believe that during this call, CORREA asked L. MARTINEZ to save some heroin and/or fentanyl ("chocolates") that L. MARTINEZ had at his location for CORREA.  I believe L. MARTINEZ agreed to do so.  Based on physical surveillance, at approximately 10:15 a.m., L. MARTINEZ's car was parked behind 281 Auburn Street, Manchester, New Hampshire.  At approximately 10:19 a.m., agents observed CORREA arrive at 281 Auburn Street and approach

the front door. At approximately 10:20 a.m., CORREA exited 281 Auburn Street, got in his car, and left the location.  I therefore believe that L. MARTINEZ had heroin and/or fentanyl at that location, which he gave to CORREA.[8]

      CORREA-M. ROSARIO-S. ROSARIO

    112.    Based on intercepted communications, I believe that M. ROSARIO is the mother of CORREA's children, and that S. ROSARIO is her sister.  As set forth in part above, agents have identified S. ROSARIO's residence at Target Location #3 as an address used by CORREA to receive drugs shipped from Puerto Rico.  In addition to the package addressed to Target Location #3 described above, which was searched and found to contain 500 grams of cocaine, agents identified two other packages shipped from Puerto Rico to Target Location #3.  In particular, on or about July 2, 2021, the Postal Service delivered a package shipped from Puerto Rico addressed to Carolina Diaz at Target Location #3.  On or about July 9, 2021, the Postal Service delivered a package shipped from Puerto Rico addressed to Jennifer Gomez at Target Location #3.  Based on the weights of the packages, I believe that each package contained

---

[8] After CORREA left 281 Auburn Street, he drove to 6 Watson Street, Manchester, New Hampshire.  Agents had identified a package addressed to Edwin Ortiz, 6 Watson Street, Manchester, New Hampshire, that had been shipped from San Juan, Puerto Rico, and was to be delivered on December 2, 2021.  Based on the fact that we had previously followed CORREA to 6 Watson Street to retrieve a package addressed to Edwin Ortiz, we believed that the December 2 Edwin Ortiz package was actually intended for CORREA.  On December 2, 2021, CORREA parked in the area of 6 Watson Street and remained in his car.  An agent observed a white van, which they later learned was a Postal Service delivery vehicle, arrive in the area.  While a surveillance agent was repositioning himself, CORREA left the area.  The agent then traveled to 281 Auburn Street and saw CORREA arrive at the residence a short time later.  CORREA parked outside of the residence and carried a weighted white plastic bag and a white box consistent in color, size, and shape with the December 2 Edwin Ortiz package towards the front door of 281 Auburn Street.  Due to his vantage point, the surveillance agent could not see whether CORREA entered the residence.  Based on my training and experience, and my familiarity with this investigation, however, I believe that CORREA retrieved the package addressed to Edwin Ortiz and took the package inside L. MARTINEZ's residence at 281 Auburn Street.  I further believe that the package contained cocaine.

approximately 500 grams of cocaine.  As set forth below, during the summer of 2021, S.

ROSARIO also stored drugs for CORREA at Target Location #3.

113.    Also as set forth in part above, M. ROSARIO assists CORREA with retrieving

packages containing cocaine.  For example, M. ROSARIO retrieved the July 9 package from

Target Location #3 and took it to Target Location #1.

*On July 9, 2021, M. ROSARIO Retrieved a Package Believed to Contain Cocaine from S.
ROSARIO and Transported It to Target Location #1.*

114.    On July 9, 2021, starting at approximately 1:00 p.m., CORREA exchanged text

messages over Target Telephone #13 with M. ROSARIO.  The text exchange was as follows:

| M. ROSARIO: | Your thing is here |
|---|---|
| M. ROSARIO: | At sonyis |
| CORREA: | I don't know |
| M. ROSARIO: | Yea the guy just left |
| M. ROSARIO: | She got it |
| CORREA: | Yea ok |
| M. ROSARIO: | Yea |

115.    Based on my training and experience, as well as my familiarity with this

investigation, I believe that during this text message exchange, M. ROSARIO told CORREA that

a package containing cocaine ("Your thing") had been delivered to Target Location #3, which is

S. ROSARIO's residence.

116.    At approximately 1:44 p.m., M. ROSARIO texted Target Telephone #13.  The

text message said, "You want me to get it?"  CORREA replied from Target Telephone #13, "If I

want yea."  Based on pole camera and physical surveillance, at approximately that time, S.

ROSARIO exited 33 Portland Street, which is the location of Target Location #3, carrying a

white box that appeared to be the package that had been delivered by the mailman that day.  S.

ROSARIO handed the package to M. ROSARIO, who was in her car outside of 33 Portland

Street.  M. ROSARIO then drove to 190 Carleton Street, arriving at approximately 1:46 p.m.,

and entered the residence carrying the package.  I believe that the package contained cocaine that CORREA had shipped from Puerto Rico.

CORREA-GUERRERO VALDEZ

117.    As set forth in part above, agents identified GUERRERO VALDEZ as a supplier of fentanyl to CORREA.  GUERRERO VALDEZ was regularly intercepted agreeing to meet with CORREA; based on my training and experience, I believe that these meetings were for the purpose of delivering fentanyl and/or collecting drug proceeds.

118.    For example, on September 9, 2021, at approximately 1:35 p.m., agents intercepted a call over Target Telephone #16 during which CORREA spoke with GUERRERO VALDEZ.  During the call, CORREA initially told GUERRERO VALDEZ that he was near his house, at 395 Salem Street.  GUERRERO VALDEZ asked, "Okay, you want me to go there?" CORREA said, "If you want, come here.  Here, there is an auto shop.  It's calm around here." GUERRERO VALDEZ asked, "How much," and CORREA said, "The same."  GUERRERO VALDEZ asked, "Half?" and CORREA affirmed.  GUERRERO VALDEZ agreed, and CORREA then said, "Listen, Duro!"  GUERRERO VALDEZ said, "Tell me," and CORREA said, "This time that you gave me the work, it was better, right?  This one is stronger?" GUERRERO VALDEZ said, "Yeah," and CORREA continued, "Uh, the fetty."  GUERRERO VALDEZ affirmed, and CORREA said, "Yeah, I knew it.  Because it dries my mouth." GUERRERO VALDEZ said, "Uh huh."  CORREA then said, "It dries the mouth, and they are not giving me any complaints.  So, if this one is the same, next time I call you, I'm going to get a whole one.  So that way, we don't have to keep seeing each other so often."  GUERRERO VALDEZ acknowledged, and CORREA said, "But it has to be good, Duro.  Because that's a problem."  GUERRERO VALDEZ again acknowledged, and CORREA said, "And I don't care

48

about spending money.  But I can't give you all that money and that stays stuck there.  Because then it gets old."  GUERRERO VALDEZ said, "Yeah, yeah, I know."  CORREA asked, "You understand?  And right now, things are, ever since I told you things were getting low, it got a little bit slow, but let's see if we can keep up again."  GUERRERO VALDEZ said, "Okay, alright."  CORREA then repeated the address where he was, and GUERRERO VALDEZ said, "I'll go shortly."

119.    Based on my training and experience, as well as my familiarity with his investigation, I believe that during this call, CORREA stated that the drugs he had received from GUERRERO VALDEZ most recently had been very high quality ("This time that you gave me the work, it was better, right?  This one is stronger?").  I believe that CORREA then specifically asked if GUERRERO VALDEZ had supplied him with fentanyl ("The fetty").  I believe GUERRERO VALDEZ affirmed, and CORREA stated that his customers had been happy with the quality.  I believe that CORREA stated that if GUERRERO VALDEZ supplied him with fentanyl again ("if this one is the same"), the next time he purchased drugs, he would obtain a kilogram ("a whole one").  I believe that GUERRERO VALDEZ agreed to meet with CORREA to supply him with half a kilogram ("A half") of fentanyl.

CORREA-RAMON

120.    As described above, RAMON was identified as a worker for or associate of a drug supplier to CORREA.  After CORREA returned 1.5 kilograms of cocaine and delivered payment for half of a kilogram of cocaine to RAMON on November 1, 2021, RAMON was stopped by police.  The drugs were seized from a hidden compartment in his car and the drug proceeds were seized from a fanny pack in the passenger compartment of the car.

CORREA-MARRERO-PEREZ FRIAS

121.     Agents have identified MARRERO and PEREZ FRIAS as workers who maintain drug stash locations for CORREA.  PEREZ FRIAS also receives packages containing drugs for CORREA and J. MARTINEZ.  As set forth above, on or about October 22, 2021, agents seized approximately 500 grams of cocaine that were shipped from Puerto Rico to Target Location #9, which is PEREZ FRIAS's residence.  PEREZ FRIAS and CORREA were intercepted discussing the loss of the package.  Representative interceptions between CORREA and MARRERO and PEREZ FRIAS are set forth below.

*On November 22, 2021, CORREA Used Target Telephone #20 to Instruct PEREZ FRIAS to Resupply Him with Drugs.*

122.     On November 22, 2021, at approximately 3:56 p.m., agents intercepted a call over Target Telephone #20 during which CORREA spoke with PEREZ FRIAS.  During the call, CORREA said, "You heard me, Gordo?"  PEREZ FRIAS said, "I'm already here at the house."  CORREA asked, "At the house?"  PEREZ FRIAS affirmed.  CORREA instructed, "Whenever you can, then, so, take out what's inside of the chocolates, and bring me other stuff."  PEREZ FRIAS agreed.  CORREA then repeated, "Don't bring me the chocolates.  I still have that, bro. Bring me the other stuff."  PEREZ FRIAS agreed.

123.     Based on my training and experience, as well as my familiarity with this investigation, I believe that during this call, CORREA asked PEREZ FRIAS to take cocaine ("the other stuff") from PEREZ FRIAS's residence ("the house") and deliver it to CORREA so that he could make sales to customers.  I believe that CORREA instructed PEREZ FRIAS not to resupply him with heroin and/or fentanyl ("chocolates") because he still had some of that left.  I believe that PEREZ FRIAS agreed to deliver the cocaine to CORREA.

124.     At approximately 7:20 p.m. that night, agents intercepted a call over Target

Telephone #20 during which CORREA again spoke with PEREZ FRIAS.  During the call,

CORREA said, "Around 8:45, more or less, I'm going to give a call, you heard?"  PEREZ

FRIAS agreed.  CORREA then stated, "I'm going to need one little ball, and I think everything

else that's left over there of the other."  PEREZ FRIAS agreed.

125.     At approximately 9:42 p.m. that night, CORREA again used Target Telephone

#20 to call PEREZ FRIAS.  During the call, CORREA asked, "Are you home?"  PEREZ FRIAS

affirmed.  CORREA then said, "I'm getting there.  Take out that back bag for me and one little

ball, Gordo."  PEREZ FRIAS said, "Alright, brother."  CORREA said, "I'm almost getting there

to pick that up."  PEREZ FRIAS said, "Call me when you're down there."  CORREA said, "I'll

be down there in about three minutes, dude.  I'm already crossing the bridge of, crossing the

bridge."  PEREZ FRIAS again said, "Alright, call me, you heard?  I'll be up here."  CORREA

agreed.  At 9:47 p.m., CORREA called PEREZ FRIAS from Target Telephone #20 and told him

he was downstairs.

126.     Based on my training and experience, as well as my familiarity with this

investigation, I believe that during these calls, CORREA asked PEREZ FRIAS to provide him

with drugs that PEREZ FRIAS was storing in his residence at 10 Clarence Terrace, Lawrence,

which is Target Location #9.  I believe that CORREA asked PEREZ FRIAS to provide him with

both cocaine ("one little ball") and with heroin and/or fentanyl ("everything that's left over there

of the other").  I believe that CORREA then went to PEREZ FRIAS's residence and picked up

the drugs.

*On November 26, 2021, CORREA Used Target Telephone #20 to Direct MARRERO to Make a Drug Sale.*

127.    On November 26, 2021, at approximately 1:25 p.m., agents intercepted a call over Target Telephone #20 during which CORREA spoke with a female identified only as "Brittany." During the call, Brittany asked, "Hey, are you around?"  CORREA affirmed.  Brittany asked, "Where should I go?"  CORREA said, "Go, what you need?"  Brittany replied, "Two," and CORREA said, "Go to Subway."  Brittany agreed.

128.    At approximately 1:26 p.m. that afternoon, CORREA used Target Telephone #20 to call MARRERO.  During the call, CORREA said, "Yo, did you see Lisa?"  MARRERO said, "Uh, no.  Not yet."  CORREA asked, "But she's on her way?"  MARRERO affirmed.  CORREA then said, "Okay, and also on her way, um, that one, as well."  MARRERO asked, "Who?" and CORREA replied, "Brittany.  She wants two."  MARRERO asked, "Brittany?"  CORREA affirmed, and MARRERO agreed.

129.    Based on my training and experience, as well as my familiarity with this investigation, I believe that during these calls, Brittany asked CORREA to sell her "two" of a quantity of drugs.  I believe that CORREA instructed Brittany to go to a Subway restaurant.  I believe that CORREA then told MARRERO to deliver the drugs to Brittany.

*On November 27, 2021, CORREA, MARRERO, and PEREZ FRIAS Discussed Drug Supply on Hand.*

130.    On November 27, 2021, at approximately 12:28 p.m., agents intercepted a call over Target Telephone #20 during which CORREA spoke with MARRERO.  During the call, CORREA asked, "What happened?  Nothing?"  MARRERO said, "No.  There's one coquito left."  CORREA said, "Oh my God."  CORREA then asked, "Did Yoli pay the fifty bucks?"  MARRERO said, "Mmmmm."  CORRREA asked for clarification, and MARRERO said, "No,

she hasn't came." CORREA then said, "She thinks she knows a lot." MARRERO said, "She still hasn't called today." CORREA then asked if she had called the day before, and MARRERO negated. MARRERO then said that her dad had called. CORREA asked, "So, right there, the only thing that's missing is the fifty from Yoli?" MARRERO said, "Exactly." CORREA then confirmed, "So, you don't have anything but a coquito?" MARRERO affirmed, and CORREA said, "So the next customer that comes, they are going to have to come over here, you heard, Gordo?" MARRERO agreed.

131.    Based on my training and experience, as well as my familiarity with this investigation, I believe that during this call, CORREA inquired as to what drugs MARRERO had left at his location. I believe that MARRERO stated that he had only one of a quantity of drugs ("coquito") left for distribution. I believe that CORREA asked whether a customer ("Yoli") had paid a debt she owed, and that MARRERO negated. I believe that CORREA instructed MARRERO to send any drug customers to CORREA's location (190 Carleton Street in Lawrence, which is the location of Target Location #1) to pick up drugs.

132.    Shortly thereafter, at 12:30 p.m., agents intercepted a call over Target Telephone #20 during which CORREA spoke with PEREZ FRIAS. During the call, CORREA said, "Bring the last of what remains, bro." PEREZ FRIAS said, "What?" and CORREA said, "Bring me what you have left." PEREZ FRIAS agreed. Immediately after this call ended, CORREA called PEREZ FRIAS back using Target Telephone #20. During the call, CORREA said, "As a matter of fact, give that to Gordo right now, and I'll tell him to have my money ready. Bring it to me here, please, because you know, um, I'm here babysitting." PEREZ FRIAS agreed.

133.    Based on my training and experience, as well as my familiarity with this investigation, I believe that CORREA asked PEREZ FRIAS to bring him drugs that PEREZ

FRIAS had at his residence at 10 Clarence Terrace, Lawrence, Massachusetts, which is Target

Location #9.  I believe that CORREA then asked PEREZ FRIAS to take the drugs to

MARRERO ("Gordo"), to pick up money from MARRERO, and to deliver the money to

CORREA at his residence, which is Target Location #1, where he was with his older children.

134.    At approximately 12:31 p.m., CORREA used Target Telephone #20 to call

MARRERO.  During the call, CORREA said, "Gordo, so, set aside the, set aside, how much,

how much, um, I bought five cocoquitos, right?"  MARRERO affirmed.  CORREA then said,

"So, if there is only one left, how much is there?  Only one-hundred and fifty?"  MARRERO

again affirmed.  CORREA then asked, "And nine-fifty of the other stuff?"  MARRERO said,

"Mmhmm."  CORREA then instructed, "Okay, so from, give, give Gordo a thousand bucks,

right, and there will be a hundred bucks left over, right?  Because there is nine-fifty and a

hundred-fifty.  Yes."  MARRERO agreed, and CORREA instructed, "Give Gordito a thousand

dollars and keep a hundred, so you could work on Monday. And so, once what Gordo and I are

going to give you sells, then I'll pay you a couple more days."  MARRERO agreed.  CORREA

then continued, "Because you were already paid off anyway, bro.  You were paid off until

Sunday night."  MARRERO again agreed.  CORREA said, "So, I'm going to pay Monday, so

you could stay until Monday and whatnot."  MARRERO said, "Alright."  CORREA then

repeated, "So tomorrow, once everything you have sells, I'll set aside the other payment in its

entirety.  So I could pay you, at least, four more days.  So you could work for me.  Or five, if you

can."  MARRERO said, "Yeah, that's what's up."

135.    Based on my training and experience, as well as my familiarity with this

investigation, I believe that during this call, CORREA confirmed that he had started off with five

of a quantity of drugs ("cocoquitos"), and that since four of those had sold, MARRERO had

collected $150.  I believe that CORREA also confirmed that MARRERO had $950 from sales of another drug ("the other stuff").  I believe that CORREA instructed MARRERO to give PEREZ FRIAS $1,000 for CORREA and to keep $100 for himself.  I further believe that CORREA told MARRERO that once he had sold the drugs that PEREZ FRIAS was going to deliver to him ("once what Gordo and I are going to give you sells"), CORREA would pay MARRERO to work for additional days.  I believe that CORREA stated that with the $100 MARRERO would be receiving he would be paid to work through the following Monday.

136.    At 1:13 p.m., PEREZ FRIAS called CORREA at Target Telephone #20 and told him, "I'm here at your house."  CORREA told PEREZ FRIAS to come inside.  Electronic surveillance outside of Target Location #1 shows that at 1:13 p.m., PEREZ FRIAS arrived in the area.  At approximately 1:14 p.m., he entered the door of 190 Carleton Street.  I believe that PEREZ FRIAS had delivered the cocaine to MARRERO, collected the $1,000 from MARRERO at Target Location #4, and taken the money to CORREA at Target Location #1.

*On December 1, 2021, CORREA Sent a Customer to Target Location #4 to Retrieve Drugs from MARRERO.*

137.    On December 1, 2021, at approximately 12:00 p.m., agents intercepted a call over Target Telephone #20 during which CORREA spoke with Brittany.  During the call, Brittany asked, "Hey, are you around?"  CORREA affirmed, and Brittany asked, "Could I head up there right now?  Like, twenty minutes away."  CORREA again affirmed and asked, "What do you need?"  Brittany said, "A'right.  Where do you wanna link up?  I think two."  CORREA said, "A'ight.  I'll let chu know where you are going right now."  Brittany said, "Huh?" and CORREA repeated, "I'mma let chu know where you are going right now."  Brittany agreed.

138.     Immediately thereafter, agents intercepted a call over Target Telephone #20 between CORREA and MARRERO.  During the call, CORREA said, "Brittany, where should I send her?"  MARRERO said, "Mm, to the house.  I'm still home."  CORREA agreed.

139.     At approximately 12:01 p.m., CORREA used Target Telephone #20 to call Brittany back.  During the call, CORREA stated, "High Street."  Brittany said, "Say that again," and CORREA said, "324 High Street."  Brittany agreed.

140.     Based on my training and experience, as well as my familiarity with this investigation, I believe that during this series of calls, Brittany asked CORREA if he would sell her "two" of a quantity of drugs.  I believe that CORREA then called MARRERO to inquire as to MARRERO's whereabouts.  I believe that after MARRERO told CORREA he was at home, CORREA instructed Brittany to go to MARRERO's residence at 324 High Street (Target Location #4) to obtain the drugs.

<u>CORREA-DEJESUS</u>

141.     Based on intercepted communications and seizure of a package of drugs addressed to DEJESUS's residence at 36 Ashland Street, as described above, DEJESUS was identified as a cocaine customer of CORREA.  Representative interceptions between CORREA and DEJESUS are set forth below.

*On March 6, 2021, CORREA and DEJESUS Discussed Cocaine CORREA Had Sold.*

142.     For example, on March 6, 2021, at approximately 11:55 p.m., agents intercepted a call over Target Telephone #5 during which DEJESUS spoke with CORREA, who was using Target Telephone #9.  During the call, DEJESUS said, "Damn, man, I received complaints."  CORREA replied, "Damn, bud.  But what you do need is help, bud."  CORREA continued, "That's it.  You need help.  Because listen, listen.  Mikey took 100, my other friend took 200,

and the other one took 200.  And none of them has called me.  And all of them are cooks.  And none has called me back."  CORREA repeated, "None of them has called me back, and all of them are cooks."  DEJESUS began to protest, and CORREA said, "You can ask Mikey and you'll see.  Call Mikey.  I sold to Mikey, and the other one, the one who sold your half.  We sold him the 200, and he cooked the whole thing, bud, slow with the same that I make."  DEJESUS said, "Damn, let me see, bud.  Chill."  CORREA then said, "And they haven't given me complaints, so stop crying so much.  If you need help, you let me know, because they are going to be active.  My friend who took the, the 100, the other one he also buys.  Mikey, too, and also the one who bought 200."  DEJESUS then said that he needed help, and CORREA said, "No, but let me know, bud, because if that is the problem, then I can help you.  But don't say that the work is bad, because the work left, and I didn't get any complaints."  DEJESUS then told CORREA, "I have a little bit of that one over here."  CORREA asked how much, and DEJESUS said, "Man, still have one sack.  A half still."  CORREA said, "A half.  Alright, I can make calls to start working on it tomorrow."

143.    Based on my training and experience, as well as my familiarity with this investigation, I believe that during this call, DEJESUS complained about the quality of cocaine that CORREA had supplied to him, possibly via L. MARTINEZ ("I received complaints.").  I believe that CORREA stated that none of his other customers had complained ("Mikey took 100, my other friend took 200, and the other one took 200.  And none of them has called me.").  I believe that CORREA stated that all of his customers had cooked the powder cocaine into crack cocaine ("[A]ll of them are cooks.").  I believe that DEJESUS stated that he needed help selling the drugs.  I further believe that DEJESUS stated that he had half a kilogram of drugs left ("A

half still"), and that CORREA stated that he would start trying to find a buyer for the drugs the following day.

*On June 15, 2021, DEJESUS Purchased Cocaine from CORREA at Target Location #1.*

144.    On June 15, 2021, at approximately 3:09 p.m., agents intercepted a call over Target Telephone #5 during which DEJESUS spoke with CORREA.  During the call, DEJESUS asked, "Is it pretty?  Is that one pretty-pretty?"  CORREA replied, "It's pretty."  DEJESUS asked, "But is it pretty-pretty, or just pretty?"  CORREA said, "Pretty-pretty.  It's pretty."  DEJESUS asked, "Is it the way you like it?"  CORREA said, "Well, to me, it's pretty.  It's pretty.  It's pretty.  Pretty, pretty, pretty, pretty?  It's not."  DEJESUS asked again, "Is it pretty-pretty for you?"  CORREA said, "But it's pretty to me, because it cooks, and you know it does everything."  DEJESUS began to ask again if it was "pretty," and CORREA said, "You'll see it, you'll see it at 4:30."  DEJESUS asked, "At 4:30?" and CORREA said, "At 4:30, I'm going to show it to you."  DEJESUS said he would tell "the guy," and CORREA said, "You'll see it.  The brand is JBL.  It's, it's, the same brand as the one that, that Flaco had.  The same brand."  DEJESUS said, "Damn.  And that work is good, Gordo?"  CORREA replied, "Yes, mine is.  Mine is straight from Puerto Rico.  He didn't sell me mine, no."  They continued to discuss quality, and CORREA said, "It cooks and everything.  If you want it, I can cook you some before I take it to you."  DEJESUS negated, and they agreed to talk again.

145.    Based on my training and experience, as well as my familiarity with this investigation, I believe that during this call, DEJESUS asked CORREA if the cocaine that CORREA had available was high quality ("Is it pretty?").  I believe that CORREA confirmed that the quality of the cocaine was good ("It's pretty.").  I believe that CORREA said that the cocaine could be cooked into crack cocaine ("it cooks").  I believe that CORREA stated that the

cocaine was very pure ("straight form Puerto Rico") and was the same as cocaine that "Flaco" had sold previously.  I believe that CORREA offered to cook some of the cocaine into crack cocaine for DEJESUS ("I can cook you some"), but DEJESUS declined.

146.    At approximately 5:20 p.m. that day, agents conducting physical and pole camera surveillance outside of Target Location #1, which is CORREA's residence, observed DEJESUS arrive in a grey Ford Edge.  DEJESUS parked outside and entered the residence.  He stayed inside until approximately 5:35 p.m., when he exited the residence and reentered the Edge.  DEJESUS then left the area.

147.    Based on my training and experience, as well as my familiarity with this investigation, I believe that DEJESUS traveled to Target Location #1 to retrieve cocaine from CORREA.

DEJESUS-MARTINEZ-WILL

148.    Prior to DEJESUS's arrest in August 2021, he and MARTINEZ partnered to distribute drugs.  WILL worked as a drug courier for DEJESUS.  Representative interceptions are set forth below.

*On January 21, 2021, MARTINEZ and DEJESUS Discussed Drugs on Hand.*

149.    At approximately 11:45 a.m. on January 21, 2021, agents intercepted a call over Target Telephone #3 between MARTINEZ and DEJESUS, who was using Target Telephone #5.  During the call, MARTINEZ asked, "About the amount you had last week, how many cocolos did you have last week?"  DEJESUS replied, "Okay, okay.  Check this out.  The first time, we have 22, eight, and 30."  MARTINEZ acknowledged, and DEJESUS said, "That was used to pay.  Plus five of the new twenty.  I mean, from the old twenty.  Okay, listen up!  Listen up!  There were 50 cocolos from the old stuff."  MARTINEZ again acknowledged, and DEJESUS

said, "There were 50 cocolos from the old stuff, and 42 big ones, right?"  MARTINEZ answered,

"Yes, 42 big ones, but listen up.  There were also 14 small ones, and you took three.  You end up

with eleven."  DEJESUS agreed, "Okay, so there are eleven.  Do the math.  Do you have a

calculator there?"  MARTINEZ replied, "No, but you do have a calculator, and you should know

how much you have left over.  Grab your other phone, and out of the eleven, how much is for

eleven?"  DEJESUS replied, "There is 9,000 and change for the eleven."  MARTINEZ then

asked, "What is the exact figure of 9,000 and change?  You are the one doing the math, and you

need to give me straight figures."  DEJESUS said, "Listen up, eleven . . . , there were eleven . . .

."  MARTINEZ began to speak, and DEJESUS continued, "Listen up, listen up!  Eleven times

850.  So, from the old ones, those are cocolos."  MARTINEZ then demanded, "Dude, so give me

the total of the math, so I know the exact figure!"  DEJESUS replied, "That's 9,350."

MARTINEZ said, "Okay, okay.  Go ahead and do this math 42 big ones."  DEJESUS then said,

"No, I didn't use the 42 big ones?"  MARTINEZ asked, "What do you mean you don't know

about the 42 big ones?"  DEJESUS replied, "I only used 27 in total."  MARTINEZ then asked,

"So, how many do you have left over?  Why 27?  Do the math, do the math for the 22 big ones

and added to the 9,300."  DEJESUS then explained, "I had to use the 27, I mean, I had to use the

five from the second one."  MARTINEZ then exclaimed, "Listen, Elvis!  Do the math and stop

talking to me about the second one!  Do the math and tell me how much for the 42 big ones?"

DEJESUS then repeated, "Dude, I have not gotten rid of the 42 big ones.  I have not gotten rid of

all of them yet."  MARTINEZ then said, "But you keep saying, you keep talking about the

second one.  If you're talking about the second one, you making it seem like you already

finished.  You are mixing things up and confusing yourself."  DEJESUS continued to try to

explain himself, before MARTINEZ told him, "Get things squared away."  DEJESUS ultimately told MARTINEZ that he would stop by.

150.    Based on my training and experience, as well as my familiarity with this investigation, I believe that during this call MARTINEZ and DEJESUS discussed drugs that DEJESUS had distributed and had left over at the drug stash location he maintains for MARTINEZ.  I believe that DEJESUS said that he had 50 of a particular quantity of heroin or fentanyl ("cocolos") and 42 of a larger quantity ("big ones") of heroin or fentanyl from an older batch of drugs ("from the old stuff").  I believe that they then discussed the value of eleven "small ones," which sell for $850 each ("eleven times 850").  I believe that DEJESUS said that the eleven "small ones" were worth $9,300, and that he had not yet distributed all of the "big ones" from the older batch of drugs.  I believe that MARTINEZ then said that he assumed DEJESUS had distributed all of the old batch because he was referring to the newer batch ("If you're talking about the second one, you making it seem like you already finished.").  I believe that MARTINEZ was frustrated with DEJESUS because he was not able to provide MARTINEZ specific figures for the value of the drugs, how much he had distributed, and what he had remaining ("Get things squared away.").

*On March 3, 2021, DEJESUS Directed WILL to Make Drug Deliveries.*

151.    On March 3, 2021, at approximately 6:28 p.m., agents intercepted a call over Target Telephone #6 during which DEJESUS spoke with WILL.  During the call, DEJESUS said, "You got More and Cross Street."  WILL replied, "Hold on, let me write it down.  Alright, I'm heading to Blanchard right now and Hector."  DEJESUS agreed, "Alright, and you got Louis."  WILL asked, "What do you mean, Louis?"  DEJESUS replied, "Louis on East Haver Street."  WILL said, "I already seen him.  He gave me bread that he owed you for one."

DEJESUS said, "Okay, you seen him.  My nigga Louis.  You see, you seen Tony?"  WILL said, "I just slaved mad shit right now."  DEJESUS replied, "You just did.  You seen Kri, right?"  WILL answered, "I just seen Kri.  He gave me a hundred for one, too."  DEJESUS asked, "Zafacon?  You seen Zafacon?"  WILL said, "Yep."  DEJESUS then asked, "You got Blanchard, and who?"  WILL replied, "I got Blanchard, Hector, More, and Cross left."  DEJESUS said, "Let me delete these niggas.  You got Cross Street and More now."  WILL repeated, "Cross, More, Hector, and Blanchard left."  DEJESUS said, "And Moraima.  You seen Moraima?"  WILL replied, "Oh, no, I didn't get to see Moraima.  So, I got them again, too."  DEJESUS added, "And then Dover Street."  WILL asked, "Farnham and Brokie, too?  He's there now?"  DEJESUS affirmed.  WILL said, "Alright, say less.  I am going to head there right now.  Damn, I got the list."  DEJESUS agreed. WILL said, "It's cool.  I need all this cash."

152.    Based on my training and experience, as well as my familiarity with this investigation, I believe that during this call, WILL and DEJESUS discussed drug deals that WILL was completing on behalf of DEJESUS.  I believe that WILL stated that he had seen certain customers and had received payment for drugs owed by them ("bread that he owed you for one"; "a hundred for one").  I believe that DEJESUS directed WILL to deliver drugs to a list of his customers.

153.    On March 3, 2021, at approximately 8:59 p.m., agents intercepted a call over Target Telephone #6 during which DEJESUS spoke with WILL.  During the call, DEJESUS asked, "Yo, you don't got no balls, no colocolos?"  WILL replied, "Hold on, let me see.  Nigga, I don't know what's got with Gilo and them.  They still haven't came, cuz."  DEJESUS said, "That nigga still haven't come down?"  WILL replied, "Nah, oh, he [unintelligible] right now."  DEJESUS asked, "What you said?" and WILL said, "Um, I got um, sixty left.  I think . . . sixty .

. . sixty.  Where the fuck that one, that other one.  Who's the last person you told me, for a sixty, cuz?"  DEJESUS asked, "You don't got no sixties?"  WILL said, "Yeah, I got one that looks, I got one here.  But I don't know who I sold the last one to."  DEJESUS again asked, "So, you don't got no sixties, no coco, no big ones?  No small ones?"  WILL replied, "Yeah [unintelligible]."  WILL said, "I got like six little ones left.  One sixty.  I'm trying to think . . . oh!  I sold it to Santos, Santos, it was Santos.  [unintelligible] That's why I was . . . I almost forgot who I sold that . . other sixty to . . . to Santos.  What?  Somebody needs one right now?"  DEJESUS negated and said, "I'm bout to go see Pop . . . do something, I just go refill you."  WILL asked, "Are you gonna come get his bread out?"  DEJESUS asked, "You got, you got one sixty?"  WILL asked, "What do you mean?"  DEJESUS repeated, "You got one sixty?"  WILL said, "One sixty, oh yeah, I got one left.  Yeah, yeah."  DEJESUS acknowledged, and WILL asked, "So, you wanna come pick up this bread?"  DEJESUS said, "Imma, Imma, Imma go over there."  WILL told DEJESUS, "Imma count the bread and get it ready then."  DEJESUS agreed and then asked, "You got Bunkerhill?"  WILL said, "I go there right now."

154.    Based on my training and experience, as well as my familiarity with this investigation, I believe that during this call, DEJESUS and WILL discussed what quantities of drugs WILL had left for distribution ("I got like six little ones left.  One sixty.").  I believe that DEJESUS stated that he was going to pick up more drugs for WILL to distribute ("I'm bout to go see Pop . . . do something, I just go refill you.").  I believe that WILL stated he would count the money he had collected for the drugs he had distributed before giving it to DEJESUS ("Imma count the bread and get it ready then.").

DEJESUS-EATON

155.    During the course of the investigation, EATON was identified as a drug customer of DEJESUS who regularly purchased cocaine and fentanyl.  As set forth above, on November 9, 2021, investigators seized cocaine and fentanyl from WILL that was intended for EATON.

*On March 30, 2021, DEJESUS and EATON Discussed Drugs DEJESUS Had Distributed to EATON and EATON Ordered More Drugs.*

156.    On March 30, 2021, at approximately 3:30 p.m., agents intercepted a call over Target Telephone #5 during which DEJESUS spoke with EATON.[9]  During the call, EATON said, "I think fucking, uh, Friday or Saturday Imma need you."  DEJESUS asked, "For what," and EATON said, "For the same thing.  A half."  DEJESUS agreed.  EATON then said, "Aight. Um, but yo, you gotta, yo, there's something fishy about that work, bro.  Like when you cook the chunks, bro, it don't come back the same as when you cook the fucking powder.  Like, the powder come back more.  Like I . . . when I cook the chunks, nigga, I lose.  You heard?" DEJESUS said, "Bro, I got no complaints from that work, bro."  EATON said that he was not complaining.  He then repeated, "When I cook the powder, it comes back more, and then when I cook the, the chunk, like I get it back or I'll lose like a gram or so.  But I'm gonna be ready Friday or Saturday for more."  DEJESUS asked, "Friday for sure?  Or Saturday?"  EATON affirmed.  EATON then said, "Hey, yo, I need that all in one.  You can't get that all in one piece?"  DEJESUS answered, "Yeah, Imma see what I could do for you."  EATON said, "Stamp 'em all, all that, you know what I mean?  So my boy, my boy didn't even grab the two fifty, bro. He ended up grabbing fuckin' fifty at a time, a hundred at a time.  So . . ."  DEJESUS agreed to "see what [he] could do" for EATON.

---

[9] EATON was identified as the user of telephone number (978) 936-3330 based on physical surveillance and comparison to a photograph of EATON on file with the Massachusetts Registry of Motor Vehicles.

157.    Based on my training and experience, as well as my familiarity with this investigation, I believe that during this call, EATON told DEJESUS that the following Friday or Saturday he wanted to receive a half kilogram of cocaine ("a half") from DEJESUS.  I believe that EATON then told DEJESUS that when he cooked some of the cocaine he had previously received from DEJESUS, the weight of the drugs decreased ("Like when you cook the chunks, bro, it don't come back the same as when you cook the fucking powder.").  I believe that DEJESUS stated that no other customer had complained about the cocaine ("work").  I believe that EATON asked if DEJESUS could provide him with half a kilogram of cocaine all in one piece, with the marking ("Stamp") of the drug supplier.  I am aware that receiving the drugs in such form assures a drug customer that the drugs have not been diluted and are of good quality.

158.    The following afternoon, agents intercepted a call over Target Telephone #5 during which EATON told DEJESUS that he was ready for Friday.  That evening, EATON and DEJESUS agreed to meet the morning of April 1, 2021.  At approximately 5:38 p.m., during an intercepted call over Target Telephone #5, DEJESUS confirmed that EATON wanted to receive only "soft."  DEJESUS further inquired, "And yo, them, them sticks was way better though, too, right?"  EATON agreed, and DEJESUS asked, "So, keep fuckin' with those people?"  EATON replied, "Yeah, stay with that."  EATON then stated, "My boy literally said today, he hasn't grabbed off me for a while, he's like, 'Yup, make sure you're around, son.  That shit's fire.'"  DEJESUS asked, "What, the, the sticks?"  EATON affirmed.

159.    Based on my training and experience, as well as my familiarity with this investigation, I believe that during this call, DEJESUS confirmed that EATON only wanted to purchase powder cocaine ("soft") and inquired about the quality of fentanyl ("them sticks") that

he had previously distributed to EATON.  I believe that EATON stated that the fentanyl was very good quality ("fire").

160.    On April 1, 2021, at approximately 10:20 a.m., agents intercepted a call over Target Telephone #5 during which DEJESUS told EATON, "I'm bout to get up and . . . leave." At 11:36 a.m., DEJESUS told EATON, "I'm already coming off the exit, not coming off the exit like to Fitch, but like, like for Lowell Connector."  EATON inquired if it would be twenty or twenty-five minutes, and DEJESUS affirmed.  At 12:08 p.m., EATON inquired, "Yo, is that you outside?"  DEJESUS affirmed.

161.    At approximately that time, agents observed DEJESUS outside of 444 Water Street in Fitchburg, Massachusetts.  Agents were unable to see whether DEJESUS entered the building, but at approximately 12:30 p.m., agents observed DEJESUS and EATON exit the building together.  Based on these calls and physical surveillance, I believe that DEJESUS delivered 500 grams of cocaine to EATON.

*On October 14, 2021, WILL Delivered Drugs to EATON.*

162.    On October 14, 2021, at approximately 7:03 p.m., agents intercepted a call over Target Telephone #18 during which WILL spoke with DEJESUS, who was using telephone number (617) 866-1445.  At the time, DEJESUS was in state custody at Middleton House of Correction (as he is now).  Based on intercepted calls, DEJESUS paid $500 to procure a cellphone in jail.  He was using the cellphone to communicate with WILL, among others. During a portion of the call, DEJESUS asked, "Uh, what's good with the nigga, um, Cloud?" WILL replied, "Um, Imma go see him tonight."  DEJESUS said, "Okay," and WILL said, "At ten."  Based in part on subsequent surveillance, as described below, agents believe that during

this call, WILL stated that he was going to go to see EATON, a drug customer of DEJESUS, that evening.

163.    At 9:52 p.m., agents observed a blue Toyota Highlander (the "Highlander") at the Speedway gas station at 615 Broadway in Lawrence.  Agents observed that WILL was one of two occupants of the vehicle.  The other occupant was female.  At 10:09 p.m., the Highlander left the gas station with WILL driving and traveled to 444 Water Street, Fitchburg, Massachusetts, which is a location where DEJESUS had traveled on multiple occasions to deliver drugs to EATON.  After the Highlander parked in the rear of the main building, agents intercepted a call over Target Telephone #18 during which WILL spoke with DEJESUS, who was using telephone number (617) 866-1445.  During the call, WILL put "Cloudy" on the telephone with DEJESUS.  Based on voice comparison, I believe that "Cloud" or "Cloudy" is EATON.  At 11:05 p.m., agents observed the Highlander depart 444 Water Street and travel back to WILL's residence at 170 Washington Street, Haverhill, Massachusetts (which is where Target Location #8 is located), where it parked in the attached parking garage.  Based on prior patterns of activity and on a subsequent intercepted call, described below, agents believe that WILL delivered drugs to EATON at 444 Water Street in Fitchburg.

164.    On October 15, 2021, at approximately 9:04 p.m., agents intercepted a call over Target Telephone #18 during which WILL spoke with DEJESUS, who was using telephone number (617) 866-1445.  During a portion of the call, WILL then stated, "Hey, yo, hey, yo, Cloud texted me and asked me how much for a whole joint of that.  What should I tell 'em?"  DEJESUS replied, "Thirty-four."  WILL said, "The four, right?"  DEJESUS affirmed.  WILL and DEJESUS then discussed what they had previously charged "Cloud."  WILL said, "Imma just tell the nigga, for that shit right there, cause he likes what we gave him yesterday, so Imma

tell the nigga, for that shit right there, bro, it's a little more pricey.  That's if you can still do it for

400."  WILL concluded the conversation by telling DEJESUS that he would call "Cloud."

165.    Based on my training and experience, as well as my familiarity with this

investigation, I believe that during this call, WILL and DEJESUS discussed EATON's inquiry

about the price for a kilogram of cocaine ("a whole joint of that").  I believe that DEJESUS

quoted a price of $34,000 per kilogram, and that WILL acknowledged that the price was above-

market.  However, WILL stated that EATON had liked the quality of the drugs WILL had

delivered the night before.

DEJESUS-MOHAMED

166.    Intercepted communications show that DEJESUS regularly supplied MOHAMED

with cocaine.  Representative interceptions and physical surveillance are set forth below.

*On May 4, 2021, DEJESUS Delivered Drugs to MOHAMED.*

167.    On May 4, 2021, at approximately 2:03 p.m., agents intercepted a call over Target

Telephone #5 during which DEJESUS spoke with MOHAMED.  During the call, MOHAMED

told DEJESUS, "I haven't really done anything, bro.  I just got like half money right now,

though."  DEJESUS said, "Oh, yeah?" and MOHAMED affirmed.  DEJESUS asked, "What, you

want me to bring you a half?"  MOHAMED's response was unintelligible, but DEJESUS then

asked, "You coming down for the half?" and MOHAMED replied, "Shit, nah.  I can't come

down.  I don't got a ride, bro."  DEJESUS then said, "I'll head out there, nigga.  In a few."

MOHAMED said, "A'ight, I'm at the crib.  You already have the address.  You been here,

right?"  DEJESUS affirmed and said, "I'll head out there in a few.  Let me, uh, I gotta get up and

shower."  MOHAMED then requested, "A'ight, bro.  Uh, just break me a half of the shit you

showed me.  You know?"  DEJESUS then stated that he was going to FaceTime MOHAMED.
That call was not intercepted.

168.    Based on my training and experience, I believe that during this call, MOHAMED
requested to obtain half a kilogram of drugs ("a half," "the half") from DEJESUS.  I believe that
DEJESUS agreed to deliver the drugs to MOHAMED ("I'll head out there, nigga.  In a few.").

169.    At approximately 3:44 p.m., agents monitoring electronic surveillance outside of
36 Ashland Street, North Andover, Massachusetts, which was DEJESUS's residence at the time,
observed DEJESUS exit the residence carrying a bag and walk to his car, a grey Ford Edge with
Massachusetts registration 2DRL63 (the "Edge"), which was parked in the driveway.  DEJESUS
placed the bag in the Edge and then proceeded to rummage around in the vehicle for several
minutes before entering the vehicle and leaving the area.  Agents conducting mobile surveillance
observed the Edge moments later but lost the vehicle in traffic shortly thereafter.  Based on an
intercepted call, DEJESUS traveled to Haverhill, Massachusetts.  Thereafter, precise location
information for Target Telephone #4, used by DEJESUS, showed that DEJESUS was traveling
north, through North Hampton, New Hampshire (at 4:52 p.m.), York, Maine (at 5:02 p.m.), and
Arundel, Maine (at 5:12 p.m.).  Based on prior surveillances, agents believed that DEJESUS was
traveling to 104 Summit Terrace, South Portland, Maine, and they proceeded to that location.

170.    At approximately 5:14 p.m., agents intercepted a call over Target Telephone #5
during which DEJESUS spoke with MOHAMED.  During the call, DEJESUS said, "I'm out
here, you heard?"  MOHAMED asked, "Yeah, you outside?" and DEJESUS said, "Nah, nah,
Imma aboutta be there, but you wasn't answering, so I was like, 'Damn this nigga!'"
MOHAMED said he had been sleeping, and DEJESUS said, "I'm like um fifteen away."  He
then stated, "Imma call you when I'm there.  Be on point."

171.     At 5:35 p.m., DEJESUS called MOHAMED.  The call was intercepted over Target Telephone #5.  DEJESUS told MOHAMED, "Yo, I'm outside."  DEJESUS asked if he should go to the door, and MOHAMED said he was in the bathroom and needed a minute.  At 5:44 p.m., during an intercepted call over Target Telephone #5, MOHAMED told DEJESUS to "come to the door."  DEJESUS agreed and then told MOHAMED that he was at the door. DEJESUS then confirmed he should go to the bottom right.

172.     At 5:54 p.m., a law enforcement agent arrived on Summit Terrace in South Portland, Maine.  He observed the Edge parked in front of building 104.  At 6:07 p.m., he observed DEJESUS exit the common front entry of 104 Summit Terrace and enter the Edge. The Edge then left the area and drove in the direction of Interstate 95.  At 7:29 p.m., agents observed via electronic surveillance that the Edge had arrived back at 36 Ashland Street in North Andover and was parked in the driveway.

173.     Based on my training and experience, as well as my familiarity with this investigation, I believe that DEJESUS traveled in the Edge to MOHAMED's residence at 104 Summit Terrace in South Portland, Maine, to deliver half a kilogram of drugs.

174.     At 8:04 p.m., DEJESUS called MOHAMED.  The call was intercepted over Target Telephone #5.  During the call, DEJESUS complained, "Yo, bro, it's barely twenty-eight here, bro."  MOHAMED expressed surprise, and DEJESUS said, "You gotta stop doing that shit, bro.  You keep making me go up there, bro."  MOHAMED asked, "How is that possible?  How is that possible?"  DEJESUS said, "Nigga, I'm counting it right now.  I just finished counting it. It's only twenty-eight thou-, twenty-eight, twenty-eight two-fifty.  What you said it was . . . ." UM7739 said, "Yo, that's crazy, bro."  DEJESUS went on to tell MOHAMED that "a stack" was missing, and later to clarify that it was "a thousand."  MOHAMED stated that he had "a

machine" and was surprised.  He further stated that he would send the money to DEJESUS via
CashApp, an application that allows people to transfer money to one another and pay for goods
and services.

175.    Based on my training and experience, as well as my familiarity with this
investigation, I believe that during this call, DEJESUS complained that MOHAMED had paid
him only $28,250 ("twenty-eight two-fifty") for the half-kilogram of drugs.  I believe that
MOHAMED had agreed to pay $29,250 for the half-kilogram.

*On June 20, 2021, DEJESUS Delivered a Kilogram of Cocaine to MOHAMED.*

176.    On June 20, 2021, at approximately 2:23 p.m., agents intercepted a call over
Target Telephone #5 during which DEJESUS spoke with MOHAMED.  During the call,
MOHAMED said, "Shit, I got like thirty-five right now.  I'm like two short.  I just counted it
out."  DEJESUS said, "You know I'm not gonna come do that."  MOHAMED acknowledged
and asked, "What's up?  Can you do it for thirty-six?"  DEJESUS expressed displeasure at the
request, and MOHAMED was ambivalent.  MOHAMED then said, "I got thirty-six."  DEJESUS
said, "On dogs, I ain't even, no bullshit, Black.  I'll do it nigga, you know?  But I'll do it for—"
MOHAMED interrupted, "Yeah, bro.  But, like, Imma keep it real for you.  If I had the whole,
like, I wouldn't even tell you this, you know?  I just pay for it."  DEJESUS said, "You just
always trynna body my packets, nigga.  But you're still my dog."  MOHAMED said he would
give DEJESUS "the bread," and DEJESUS said, "Nah, it's cool, brodie.  Thirty-six is cool this
time."  MOHAMED told DEJESUS to "make sure is amazing bro, please."  DEJESUS told him,
"Poison, my nigga."  MOHAMED then said, "Please, bro.  You know, I'm trynna compete with
these niggas.  I'm trynna compete, fam."  MOHAMED asked when DEJESUS was going to
"come through," and DEJESUS asked whether MOHAMED wanted him to "head over there"

that day or the following day.  MOHAMED replied, "As soon as possible, bro."  DEJESUS

complained but stated that he would "get over there" that day.

177.   At 2:34 p.m. that afternoon, during an intercepted call over Target Telephone #5,

DEJESUS and MOHAMED discussed where DEJESUS should go.  MOHAMED told him to go

to "the same spot," and clarified that it was "one-oh-four."  DEJESUS told MOHAMED that he

would arrive at 4:30.

178.   At approximately 4:49 p.m. that afternoon, during an intercepted call over Target

Telephone #5, DEJESUS told MOHAMED that he would arrive in "fifteen."  MOHAMED

confirmed that he was "there" and told DEJESUS to "call . . . when you outside."

179.   Based on my training and experience, I believe that during this series of calls,

DEJESUS agreed to deliver a kilogram of cocaine to MOHAMED for $36,000 ("thirty-six").  I

believe that MOHAMED first asked if he could pay $35,000 ("thirty-five") for the drugs, and

that DEJESUS declined to sell the drugs for that price.  I believe that MOHAMED asked

DEJESUS to be sure he was distributing high-quality drugs to MOHAMED ("make sure is

amazing"), and that DEJESUS stated that the drugs were very potent ("Poison").  I believe that

MOHAMED said that he was competing with other drug dealers ("I'm trynna compete with this

niggas").  I believe that MOHAMED told DEJESUS to deliver the drugs to 104 Summit Terrace,

South Portland, Maine ("one-oh-four"), and that DEJESUS updated MOHAMED regarding his

anticipated arrival in Maine.

180.   That day, the GPS tracking device affixed to the Edge showed that the Edge left

DEJESUS's residence at 36 Ashland Street, North Andover, Massachusetts, at approximately

2:41 p.m.  The Edge made one stop at 3:30 p.m. at an address in Methuen, Massachusetts, before

traveling to 102 Summit Terrace, South Portland, Maine, where it arrived at approximately 5:16

p.m.  The Edge remained on Summit Terrace until approximately 6:01 p.m., when it returned to

36 Ashland Street, arriving at 7:25 p.m.  Based on my training and experience, as well as my

familiarity with this investigation, I believe that DEJESUS transported a kilogram of cocaine to

MOHAMED at 104 Summit Terrace in South Portland, Maine.

<u>MARTINEZ-REYES-HERNANDEZ MERCEDES</u>

181.     Intercepted communications show that REYES regularly supplied MARTINEZ

with cocaine.  REYES employed HERNANDEZ MERCEDES as a drug and money courier who

made the deliveries of drugs to MARTINEZ.  Representative examples of interceptions and

physical surveillance are set forth below.

   *On April 7, 2021, REYES Sent HERNANDEZ MERCEDES to Deliver Cocaine to*
   *MARTINEZ at Target Location #7.*

182.     On April 7, 2021, at approximately 7:12 p.m., agents intercepted a call over

Target Telephone #3 during which MARTINEZ spoke with REYES, who was using Target

Telephone #12.  During the call, REYES asked, "What did you want?"  MARTINEZ said, "Talk

to me, talk to me, so I can think and let you know what, what, I--."  REYES interrupted and said,

"No, at, at three seven."  MARTINEZ replied, "Damn," and REYES said, "So, so we could keep

going down."  MARTINEZ said, "Make it, lower it to half.  And send, send me the entire thing,

but you already know."  REYES agreed.  MARTINEZ then repeated, "Send me the entire thing,

you heard?"  REYES again agreed.

183.     Based on my training and experience, as well as my familiarity with this

investigation, I believe that during this call, MARTINEZ asked for the price of cocaine REYES

was selling, and REYES stated that it was $37,000 per kilogram ("at three seven").  I believe that

MARTINEZ was unhappy with the price and asked REYES to lower the price to $36,500 per

kilogram ("lower it to half").  I believe that MARTINEZ said that at that price, he wanted to

purchase a kilogram of drugs ("send me the entire thing").  I believe that REYES agreed to do the deal.

184.     At approximately 7:14 p.m., MARTINEZ used Target Telephone #3 to call REYES on Target Telephone #12 and asked, "How much are we on right now?"  REYES said he would look and call MARTINEZ back.  At approximately 7:16 p.m., REYES used Target Telephone #12 to call Target Telephone #3 and said, "Twelve eight."  MARTINEZ then said, "Okay.  Send him."  REYES said, "Yes, alright.  He already left."

185.     Based on my training and experience, as well as my familiarity with this investigation, I believe that during these calls, MARTINEZ asked how much his drug debt to REYES was, and I believe that REYES told MARTINEZ that he currently owed $12,800 ("Twelve eight") for drugs previously received.  I believe that MARTINEZ told REYES to send his drug courier to deliver the kilogram ("Send him"), and that MARTINEZ said he had already done so.

186.     At approximately 7:35 p.m. that night, agents intercepted a call over Target Telephone #3 during which MARTINEZ spoke with HERNANDEZ MERCEDES, who was using Target Telephone #14.  During the call, HERNANDEZ MERCEDES said, "Leave it open. I'm arriving there soon."  MARTINEZ agreed.

187.     At approximately 7:38 p.m., an agent monitoring a pole camera outside of 111 Margin Street, which is where Target Location #7 is located, observed a male wearing a blue jacket with white stripes enter the residence.  Moments later, I observed the same male standing in front of the second-floor interior door of 111 Margin Street.[10]  At approximately 7:46 p.m., the male wearing the blue jacket with white stripes exited 111 Margin Street and walked to a grey

---

[10] I was conducting physical surveillance from outside of 111 Margin Street.

Honda Accord (the "Accord"),[11] which was parked on the street nearby.  The male entered the

Accord and traveled to 311 Water Street, Lawrence, Massachusetts, where he parked in a

parking lot at the back of the apartment complex.

188.   Based on my training and experience, I believe that HERNANDEZ MERCEDES

traveled to Target Location #7 to deliver a kilogram of cocaine to MARTINEZ on behalf of

REYES.

*On May 11, 2021, REYES Sent HERNANDEZ MERCEDES to Deliver Cocaine to
MARTINEZ at Target Location #7.*

189.   On May 11, 2021, at approximately 5:47 p.m., agents intercepted a call over

Target Telephone #3 during which MARTINEZ spoke with REYES, who was using Target

Telephone #12.  During the call, MARTINEZ said, "I'm going over there now.  I'm heading

there now."  REYES said, "Oh, alright."  MARTINEZ then said, "Okay.  Boss!"  REYES said,

"Talk to me," and MARTINEZ asked, "The same?"  REYES answered, "Yes, the same.  The

same."  MARTINEZ said, "Huh?" and REYES repeated, "It's the same still."  MARTINEZ then

asked, "Why don't you round it off?"  REYES said, "I can't round it off, because, imagine.

What am I going to make?"  MARTINEZ said, "Huh?" and REYES encouraged, "Get two round

ones."  MARTINEZ agreed, and REYES asked, "But you're going there now?"  MARTINEZ

affirmed.

190.   Based on my training and experience, as well as my familiarity with this

investigation, I believe that during this call, MARTINEZ told REYES that he was going home.  I

believe that MARTINEZ asked whether the cocaine that REYES was selling was the same price

as he had paid previously ("The same?").  I believe that REYES confirmed that it was.  I believe

---

[11] The Accord was registered to Edwin Arias at 26 Arlington Street, #1, Lawrence,
Massachusetts.

that MARTINEZ then asked if REYES could charge him $36,000 per kilogram instead ("round it off"), and that REYES said he would make no profit at that price.  I believe that REYES encouraged MARTINEZ to purchase two kilograms of cocaine for $36,000 each ("Get two round ones."), and that MARTINEZ agreed.

191.    At approximately 6:20 p.m., MARTINEZ used Target Telephone #3 to call REYES on Target Telephone #12.  REYES said, "Give him a few minutes."  MARTINEZ agreed and asked, "How much were we at?"  REYES said, "Fourteen, I think it is."  MARTINEZ agreed.

192.    Based on my training and experience, as well as my familiarity with this investigation, I believe that during this call, REYES said that HERNANDEZ MERCEDES would deliver the kilogram to MARTINEZ shortly ("Give him a few minutes.").  I believe that MARTINEZ asked what his current debt to REYES was, and that REYES stated that it was $14,000 ("Fourteen, I think it is.").

193.    At approximately 6:13 p.m., agents observed the Accord parked in a parking lot behind the apartment complex at 311 Water Street in Lawrence.  At approximately 6:27 p.m., agents observed the Accord driving away from 311 Water Street.  The Accord traveled to Margin Street in Lawrence and parked in front of 111 Margin Street, where Target Location #7 is located.  HERNANDEZ MERCEDES then exited the car and walked to the door of the residence.  While he was on the front porch of the residence, he appeared to be using his cellular telephone.

194.    At approximately 6:30 p.m., agents intercepted a call over Target Telephone #3 during which MARTINEZ spoke with HERNANDEZ MERCEDES, who was using Target Telephone #14.  During the call, HERNANDEZ MERCEDES said, "Open up for me, please."  I

believe that HERNANDEZ MERCEDES was waiting for MARTINEZ to open the front door of the residence for him.  Moments later, the front door of the residence opened, and HERNANDEZ MERCEDES walked inside.

195.     At approximately 6:38 p.m., HERNANDEZ MERCEDES exited 111 Margin Street and entered the Accord.  He then drove back to 311 Water Street and parked in the parking lot in the rear of the building.  HERNANDEZ MERCEDES exited the car and entered 311 Water Street.

196.     Based on the information set forth above, I believe that HERNANDEZ MERCEDES left from 311 Water Street to deliver drugs to MARTINEZ at Target Location #7 on behalf of REYES, and that he returned to 311 Water Street after the transaction.

*On August 25, 2021, REYES Sent HERNANDEZ MERCEDES to Deliver Drugs to MARTINEZ at Target Location #7.*

197.     On August 25, 2021, at approximately 5:39 p.m., agents intercepted a call over Target Telephone #3 during which MARTINEZ spoke with REYES.  The call also was intercepted over Target Telephone #12.  During the call, MARTINEZ said, "I'm going to need another stick."  REYES said, "Of the small ones."  MARTINEZ agreed.  REYES said, "Alright," and MARTINEZ said, "You already know."

198.     At approximately 5:40 p.m., agents intercepted a call over Target Telephone #12 during which REYES spoke to HERNANDEZ MERCEDES.  During the call, REYES asked, "Is the one there soft?"  HERNANDEZ MERCEDES asked, "Which one?"  REYES said, "The one you cut."  HERNANDEZ MERCEDES affirmed.  REYES then instructed, "Take a hundred bucks to Bimbo."  HERNANDEZ MERCEDES asked, "Just that?"  REYES said, "Add five.  So, you already know, the softer, the better."  HERNANDEZ MERCEDES agreed.

199.     At approximately 6:11 p.m., agents intercepted a call over Target Telephone #3 during which MARTINEZ spoke with HERNANDEZ MERCEDES.  During the call, HERNANDEZ MERCEDES said, "Boss, I'm almost there."  At 6:13 p.m., during an intercepted call over Target Telephone #3, MARTINEZ told HERNANDEZ MERCEDES, "It's opened down there.  It's not open?"  HERNANDEZ MERCEDES said, "No, it's closed."  MARTINEZ asked, "It's closed?" and HERNANDEZ MERCEDES affirmed.  MARTINEZ then said, "Hold on."

200.     A court-authorized GPS tracking device affixed to the HERNANDEZ MERCEDES CR-V[12] shows that at approximately 6:12 p.m., the car parked on Lowell Street, Lawrence, Massachusetts, by the corner of Margin Street.  This location is around the corner from MARTINEZ's residence at Target Location #7.  Based on pole camera surveillance, at 6:13 p.m., HERNANDEZ MERCEDES walked up the front stairs of 111 Margin Street, where MARTINEZ resides, and entered the building.  At approximately 6:26 p.m., agents observed HERNANDEZ MERCEDES exit 111 Margin Street, enter his car, and drive to his residence at 311 Water Street in Lawrence.

201.     Based on my training and experience, as well as my familiarity with this investigation, I believe that during this series of calls, MARTINEZ requested an additional 100 grams of cocaine ("I'm going to need another stick") from REYES.  I believe that REYES agreed to supply the drugs and then contacted HERNANDEZ MERCEDES to deliver them.  I believe that REYES asked HERNANDEZ MERCEDES if he had powder cocaine available at the stash location ("Is the one there soft?").  I believe that REYES instructed HERNANDEZ MERCEDES to deliver the 100 grams ("a hundred bucks") to MARTINEZ ("Bimbo").  I believe

---

[12] At the time, the registration on the car was Massachusetts 1GRX22.  The car was registered to HERNANDEZ MERCEDES at 26 Arlington Street, Lawrence, Massachusetts.

REYES instructed HERNANDEZ MERCEDES to add additional cutting agent to the drugs ("Add five."). I believe that HERNANDEZ MERCEDES then traveled to Target Location #7 to deliver the drugs.

*On November 8, 2021, REYES Sent HERNANDEZ MERCEDES to Deliver Drugs to MARTINEZ at Target Location #7.*

202.    On November 8, 2021, at approximately 12:40 p.m., agents intercepted a call over Target Telephone #12 during which REYES spoke with MARTINEZ. During the call, MARTINEZ asked, "How are we?" REYES said, "We are at three plus the last two." MARTINEZ said, "Huh?" and REYES said, "At thr-, hold on, I'm going to tell you right now. [ASIDE: Thirty-one, three.] Nine, six hundred." MARTINEZ said, "Oh, okay, so you can send him. So you could send me that, but you already know." REYES agreed, and MARTINEZ repeated, "But you already know. I don't have to tell you anything else. We don't have to [AUDIO BREAKS]." REYES interrupted, but MARTINEZ continued, "But isn't there a discount? Because I've seen things are kind of, I--." REYES interrupted and said, "Lower it, lower it a thousand bucks. Imagine, lower it a thousand bucks." MARTINEZ talked over REYES and said, "Imagine, I'm asking you, because imagine." MARTINEZ then said, "No, you know how it is, you know I don't, but I kind of know, you heard?" REYES said, "Yeah, yeah, yeah. It's fine. Lower it a thousand bucks." MARTINEZ said, "Alright, there's no problem." REYES agreed, and MARTINEZ said, "Send him over!" REYES said, "Tell me?" and MARTINEZ repeated, "Okay, send him over, okay."

203.    Based on my training and experience, as well as my familiarity with this investigation, I believe that during this call, MARTINEZ asked REYES how much money he owed REYES ("How are we"), and that REYES said MARTINEZ owed him $9,600. I believe that MARTINEZ then asked REYES to send HERNANDEZ MERCEDES to deliver drugs to

him ("send him").  I believe that MARTINEZ then asked whether the price of the drugs was

lower ("discount"), and REYES told him he would charge $1,000 less per kilogram ("lower it a

thousand bucks").  I believe that MARTINEZ agreed and confirmed that HERNANDEZ

MERCEDES should deliver the drugs.

204.    Thereafter, at approximately 12:42 p.m., agents intercepted a call over Target

Telephone #12 during which REYES spoke with HERNANDEZ MERCEDES, who was using

Target Telephone #14.  During the call, REYES instructed, "[T]ake the one that belongs to the

bald guy."  HERNANDEZ MERCEDES confirmed, "The bald guy?" and REYES said, "Uh-

huh.  Take the one from the small napkin, because that one is more explosive for him."

HERNANDEZ MERCEDES agreed.  Based on my training and experience, as well as my

familiarity with this investigation, I believe that during this call, REYES instructed

HERNANDEZ MERCEDES to deliver drugs from a certain batch ("the one from the small

napkin") to MARTINEZ ("the bald guy").

205.    Agents observed HERNANDEZ MERCEDES leave from 311 Water Street,

Lawrence.  HERNANDEZ MERCEDES drove directly to 111 Margin Street in the

HERNANDEZ MERCEDES CR-V (the registration for which had been changed to 2YSD78)

and arrived at approximately 12:55 p.m.  HERNANDEZ MERCEDES carried a weighted

plastic bag into the house.  HERNANDEZ MERCEDES exited the residence at approximately

1:04 p.m.  Based on my training and experience, as well as my familiarity with this investigation,

I believe that HERNANDEZ MERCEDES delivered the drugs to MARTINEZ at Target

Location #7.

DEJESUS-MARTINEZ-WILL-SANCHEZ

206.     As set forth above, during November 2021, agents intercepted calls between DEJESUS and WILL during which they discussed a Correctional Officer who had helped DEJESUS obtain a contraband cellphone inside the Middleton House of Correction.  The Correctional Officer ultimately was identified as SANCHEZ.  SANCHEZ was using a telephone subscribed in his name to communicate with the contraband cellphone used by DEJESUS.

207.     On November 11, 2021, WILL and MARTINEZ provided SANCHEZ with a package containing fentanyl, cocaine, and Suboxone for SANCHEZ to smuggle into the Middle House of Correction for DEJESUS.  The package was seized from SANCHEZ as he entered the jail for work.[13]

DEJESUS-PIZARRO-ROSA-CHIRIPA

208.     As set forth in part above, until his arrest in August 2021, DEJESUS supplied PIZARRO-ROSA with cocaine.  CHIRIPA was a cocaine customer of PIZARRO-ROSA.  Representative interceptions are set forth below.

*On December 16, 2020, PIZARRO-ROSA Obtained Cocaine from DEJESUS at 32 Exchange Street.*

209.     On December 16, 2020, at approximately 11:18 a.m., agents intercepted a call over Target Telephone #1 during which PIZARRO-ROSA spoke with DEJESUS, who was using Target Telephone #5.  During the call, PIZARRO-ROSA asked, "Where are you?"  DEJESUS replied, "I've been seeing a couple people.  You know how it is.  I start working early."  PIZARRO-ROSA acknowledged, and DEJESUS said, "I'll pull up wherever you are."  PIZARRO-ROSA negated, and DEJESUS said, "Or you can go there directly."  PIZARRO-

---

[13] Intercepted calls indicate that SANCHEZ was aware that the package contained Suboxone and a SIM card for DEJESUS's contraband cellphone.

ROSA replied, "Yes, I'm going to go there, because someone wants seven and a half, but that's a sure thing.  That, just need to take it out and put it aside.  I just need to call the person and confirm it."  DEJESUS clarified, "Okay, okay.  And you want to take seven and a half out of that one?"  PIZARRO-ROSA affirmed, and DEJESUS said, "That's fine, no problem."  PIZARRO-ROSA then explained, "And that's because he's working on the other stuff, to see . . . because the guy who called last night, I'm not sure it, I don't know.  But he told me, 'Find out if this is a sure thing, because we will need to call the person who is at work that it is all set when he gets off from work.'"  DEJESUS said, "You should have said something."  PIZARRO-ROSA said, "He called just today."  DEJESUS then asked, "Oh, he told you that – what does he mean that it's a sure thing?"  PIZARRO-ROSA replied, "What he means is to have that ready, and he will call the guy who is working, and he knows that is all set."  DEJESUS then asked, "Okay, okay, the seven and a half, you mean?"  PIZARRO-ROSA affirmed.  DEJESUS said, "Okay, okay.  So that is all set, all set."  PIZARRO-ROSA said, "Okay.  I can stop by right now, if you want?"  DEJESUS negated and said he would send PIZARRO-ROSA the address.  They then discussed where DEJESUS lived, and PIZARRO-ROSA asked, "Well, it's a sure thing.  You can bring it to me if you want?"  DEJESUS agreed.

210.    Based on my training and experience, as well as my familiarity with this investigation, I believe that during this call, PIZARRO-ROSA told DEJESUS that he had a customer who wanted to purchase a quarter of an ounce of cocaine ("someone wants seven and a half").  I believe that DEJESUS agreed to provide PIZARRO-ROSA with the drugs ("That's fine, no problem.").  I believe that PIZARRO-ROSA at first stated that he would go to pick up the drugs from DEJESUS's residence ("I can stop by right now, if you want?"), and that DEJESUS subsequently agreed to deliver the drugs to PIZARRO-ROSA.

211.    At approximately 11:24 that morning, agents intercepted another call over Target

Telephone #1 between PIZARRO-ROSA and DEJESUS, who was again using telephone number

(857) 269-7671.  During the call, PIZARRO-ROSA said, "In order for us not to be messing

around too much, just bring me the entire bag, because if anything, I'll keep the rest."  DEJESUS

confirmed, "The entire bag?" and PIZARRO-ROSA said, "Yes, that way, we are not . . . you

know?"  DEJESUS agreed.  PIZARRO-ROSA asked, "So, he told you how that looks, right?"

DEJESUS replied, "Of course, he's gonna see it."  PIZARRO-ROSA agreed.  PIZARRO-ROSA

then said, "Yes, because that way, I'll, uh . . . I'll meet with the man, and I do that, because he is

saying, that's not . . . but that it's a sure thing."  DEJESUS agreed but said, "[L]isten, the thing is

that . . . that's fine, but, uh, today's Wednesday . . . , on Friday, I have to take that stuff to those

people.  Early Friday."  PIZARRO-ROSA said, "No, but that money from the other person is for

today."  DEJESUS acknowledged, and PIZARRO-ROSA said, "The other two and a half, that

I'm literally going to get rid of today or tomorrow."  DEJESUS acknowledged, and PIZARRO-

ROSA said, "I'm going to keep it, and I'll pay it myself."  DEJESUS stated, "Oh, so that's not a

problem."  DEJESUS then repeated, "No, what I'm telling you is that at least by Friday . . . you

know?"  PIZARRO-ROSA acknowledged, and DEJESUS said, "Alright then, buddy.  I'm

heading over there."

212.    Based on my training and experience, as well as my familiarity with this

investigation, I believe that during this call, PIZARRO-ROSA asked DEJESUS to deliver a

larger quantity ("the entire bag") of cocaine to him.  I believe that DEJESUS told PIZARRO-

ROSA that he needed to receive payment for the drugs within two days ("today's Wednesday . . .

, on Friday, I have to take that stuff to those people").  I believe that PIZARRO-ROSA stated

that he would have payment for the quarter ounce that day ("No, but that money from the other

person is for today."), and that he would pay for the remainder of the drugs without distributing it if necessary ("The other two and a half . . . I'm going to keep it, and I'll pay it myself.").  I believe that DEJESUS agreed to deliver the drugs.

213.    Based on pole camera surveillance, at approximately 12:14 p.m. that day, DEJESUS arrived outside 32 Exchange Street.  PIZARRO-ROSA was waiting on the front porch.  DEJESUS approached PIZARRO-ROSA, and they entered the residence together.  At approximately 12:15 p.m., DEJESUS exited 32 Exchange Street.

214.    Based on my training and experience, as well as my familiarity with this investigation, I believe that DEJESUS delivered the drugs to PIZARRO-ROSA inside of 32 Exchange Street.  Based on intercepted calls, I believe that PIZARRO-ROSA returned the drugs to DEJESUS the following day because they were poor quality.

*On January 29, 2021, PIZARRO-ROSA and CHIRIPA Discussed Cocaine PIZARRO-ROSA Had Supplied.*

215.    On January 29, 2021, at approximately 5:58 p.m., agents intercepted a call over Target Telephone #1 during which PIZARRO-ROSA spoke with CHIRIPA, who was using Target Telephone #7.  During a portion of the call, CHIRIPA said, "Dammit, just now someone else complained.  He came to buy 200 from me, but only bought 100."  PIZARRO-ROSA said, "Maybe he didn't clean it."  CHIRIPA replied, "That it keeps burning his nose."  PIZARRO-ROSA started to say, "No, no, no.  But what—" and CHIRIPA talked over him, "But the stuff was good.  It's just that it's like that."  PIZARRO-ROSA asked, "So, you tell me, what?"  CHIRIPA said, "But it's white.  Try to see if there is some of the white one, but that one, imagine."  Ultimately, CHIRIPA told PIZARRO-ROSA that he did not want to buy more of the "same thing."

216.     Based on my training and experience, as well as my familiarity with this investigation, I believe that during this call, CHIRIPA told PIZARRO-ROSA that a customer had complained about cocaine that CHIRIPA had received from PIZARRO-ROSA ("someone else complained").  I believe that the customer told CHIRIPA that the cocaine burned his nose when he snorted it ("it keeps burning his nose").  I believe that CHIRIPA said that the quality of the cocaine was good ("the stuff was good"), but that he did not want to buy more from the same batch of drugs.

<u>Criminal Activity at the Target Locations</u>

217.     Based on information set forth herein, there is probable cause to believe that evidence of drug distribution will be located inside of the Target Locations.

<u>Target Location #1: 190 Carleton Street, First Floor, Lawrence, Massachusetts</u>

218.     190 Carleton Street, Lawrence, Massachusetts is part of a multi-family residence. The structure is three stories and is covered in beige clapboard siding.  It has white trim.  The residence has two front doors facing Carleton Street.  The doors are white and are located off of a covered porch.  The door to 190 Carleton Street is the left-hand door.  It is marked with the number "190."  Target Location #1 is the first floor apartment inside of 190 Carleton Street.

219.     Based on intercepted communications, physical and pole camera surveillance, precise location data for telephones used by CORREA, and GPS tracking data for a GPS tracking device installed on a car used by CORREA, I believe that CORREA and M. ROSARIO reside at Target Location #1 with their children.  Other agents and I have frequently observed CORREA and M. ROSARIO coming and going from 190 Carleton Street.  During warm weather, agents also frequently observed CORREA spending time on the porch outside the front door to 190 Carleton Street.  As recently as December 2021, precise location data for Target Telephone #20,

used by CORREA, shows that the phone is usually located overnight in the area of Target Location #1.  M. ROSARIO is the subscriber to utilities at Target Location #1.

220.    As detailed herein, CORREA is a large-scale drug distributor who obtains cocaine in Puerto Rico for distribution in Massachusetts and also distributes heroin and/or fentanyl. CORREA employs multiple workers to assist with storing and distributing drugs, and he maintains multiple drug stash locations.  Over the course of this investigation, CORREA has been intercepted using six different telephones to communicate with his co-conspirators.

221.    As described in part herein, intercepted communications and physical and pole camera surveillance show that CORREA has conducted drug distribution activity out of Target Location #1 for at least eight months.  As set forth above, as recently as November 27, 2021, CORREA has been intercepted discussing distributing drugs out of 190 Carleton Street and has been observed receiving drug proceeds there.

222.    In addition, since late June 2021, other investigators and I have identified six packages sent from Puerto Rico to 190 Carleton Street, Lawrence, or to 34 Coolidge Street, Lawrence, which is part of the same residential structure as 190 Carleton Street.  More specifically, on or about June 25, 2021, the United States Postal Service ("USPS") delivered a package addressed to "Josue CORREA," 34 Coolidge Street, Lawrence, Massachusetts; on or about July 2, 2021, USPS delivered a package addressed to Marcus Aponte, 190 Carleton Street Lawrence, Massachusetts; on or about July 9, 2021, USPS delivered a package addressed to Joseph CORREA, 34 Coolidge Street, Lawrence, Massachusetts; on or about July 21, 2021, USPS delivered a package addressed to Gladys Rosario, 190 Carleton Street, Lawrence, Massachusetts; and on or about July 30, 2021, USPS delivered a package addressed to Maribel Alamo, 34 Coolidge Street, Lawrence, Massachusetts.  After each of these packages was

delivered, they were retrieved by CORREA or L. MARTINEZ and taken inside of 190 Carleton Street.  Based on my training and experience, and my familiarity with this investigation, I believe that each of these packages contained approximately 500 grams of cocaine.

223.    I also am aware that CORREA and/or M. ROSARIO have retrieved packages sent from Puerto Rico to Target Location #3 and taken the packages into 190 Carleton Street.  In particular, on July 2, 2021, CORREA retrieved a package shipped from Puerto Rico to Target Location #3 and took the package back to 190 Carleton Street; on July 9, 2021, and M. ROSARIO retrieved a package sent to Target Location #3 and took it inside 190 Carleton Street. Based on the weight of the packages, I believe each of those packages contained approximately 500 grams of cocaine.

224.    For these reasons, I believe that evidence of CORREA's ongoing drug distribution activities will be located inside of Target Location #1.

Target Location #2: All American Self Storage, 255 Hampstead Street, Methuen, Massachusetts, Unit 131

225.    All American Self Storage, 255 Hampstead Street, Methuen, Massachusetts is a commercial storage facility consisting of a collection of one-story light-colored buildings housing multiple garage bays, each with a garage door.  The garage bays are numbered, with the number marked on a small plaque next to the garage door.  There is a black metal fence around the property.  The management office is located inside a two-story structure clad in light-colored clapboard siding with white trim.  Target Location #2 is Unit 131.  Unit 131 is located in a bay of garages behind the management office.

226.    CORREA has been intercepted discussing maintaining a storage unit and making payment therefor.  An employee of All American Storage stated that Unit 131 was rented in the name Joseph CORREA and had been so rented for nearly four years.

227.     Based on intercepted communications and surveillance observations, I believe

that CORREA stores drugs and drug proceeds at Target Location #2.  For example, on or about

October 20, 2021, USPS delivered a package shipped from Puerto Rico to Don Pappalardo at 39

Frye Road, Lawrence.  CORREA was at 39 Frye Road standing in the front door of the

residence, behind the storm door.  When the package was delivered, CORREA exited the

residence, retrieved the package from the porch, and drove directly to All American Storage.

Agents were not able to see what storage unit CORREA accessed, but via electronic surveillance,

agents were able to see that CORREA accessed a unit in the area of Unit 131.  I believe that the

package CORREA retrieved from 39 Frye Road contained cocaine, and that CORREA took the

cocaine to Target Location #2.

228.     As set forth above, on November 1, CORREA traveled to Connecticut to return

cocaine and remit payment for cocaine to an associate of an unidentified drug supplier.  Prior to

making the delivery, agents intercepted calls during which CORREA told the supplier that he

needed to retrieve the drugs from his "garage."  That night, agents observed CORREA travel to

All American Storage and access a storage unit there.  Agents were unable to see exactly which

unit CORREA accessed, but they were able to see that he accessed a unit in the same area where

Unit 131, which is Target Location #2, is located.

229.     Accordingly, I believe there is probable cause to believe that evidence of

CORREA's drug distribution activities will be located inside of Target Location #2.

Target Location #3: 33 Portland Street, Third Floor, Lawrence, Massachusetts

230.     33 Portland Street, Lawrence, Massachusetts is a multi-family, three-story

residential structure.  The residence is covered in light blue clapboard siding and has white trim.

There is a parking area in front of the building.  The building has two front doors, which are

located off of a covered porch with a white railing.  The third floor apartment, which is Target Location #3, is accessed via the left-hand door to the residence

231.    I believe that S. ROSARIO resides at Target Location #3 because over the course of the investigation, she has frequently been observed coming and going from 33 Portland Street. Most recently, S. ROSARIO was observed outside of 33 Portland Street on December 10, 2021. Moreover, as described above, after a package addressed to 33 Portland Street, second floor containing cocaine was seized by investigators on or about July 30, 2021, CORREA was intercepted telling CORREA-DONES that he believed the package had been seized or stolen because he had sent too many packages to "Sonyi's address."[14]  Records on file with the Massachusetts Registry of Motor Vehicles list S. ROSARIO's residence as Target Location #3. In addition, the utilities for 32 Portland Street, third floor are subscribed to S. ROSARIO.[15]  As such, I believe that S. ROSARIO resides in the third floor apartment at 33 Portland Street.

232.    In addition to the July 30 seized package, since late June 2021, other investigators and I have identified two other packages sent from Puerto Rico to 33 Portland Street, second floor, which is the apartment below Target Location #3.  Specifically, on or about July 2, 2021, USPS delivered a package addressed to Carolina Diaz at 33 Portland Street, second floor, and on or about July 9, 2021, USPS delivered a package addressed to Jennifer Gomez at 33 Portland Street, second floor.  Based on physical surveillance, those packages were retrieved by CORREA and M. ROSARIO and taken back to 190 Carleton Street.

---

[14] I am aware that drug traffickers who send packages through the mail sometimes slightly alter the destination address so as to avoid law enforcement apprehension in the event the package is seized.

[15] 32 Portland Street and 33 Portland Street are part of the same residential structure. Based on my experience with three-story multi-family residences in Lawrence, I believe that the door leading to 32 Portland Street accesses the first floor apartment of the building, and that the door leading to 33 Portland Street accesses the second and third floor apartments of the building.

233.     Intercepted calls also show that S. ROSARIO previously was maintaining a drug stash location for CORREA at Target Location #3.   Representative interceptions are set forth below.

*On July 7, 2021, CORREA and S. ROSARIO Discussed Drugs that S. ROSARIO Was Maintaining for CORREA at Target Location #3.*

234.     On July 7, 2021, at approximately 10:03 p.m., agents intercepted a call over Target Telephone #13 during which CORREA spoke with S. ROSARIO.  During the call, CORREA called S. ROSARIO "Sonyi" and said, "[C]heck if there's something around there, because that's not squaring out there."  S. ROSARIO asked, "How so?" and CORREA said, "Check if there's a little ball of ten around there."  S. ROSARIO said, "Mmmm.  The last time that he took, that Pollito took, was the tiny one. The one of Soplo's."  CORREA asked, "And how many times did you take to him?"  S. ROSARIO asked, "Uh, how many times?"  CORREA affirmed and said, "Because look, when you, listen to this, right?  When I gave that to you, right?  I took a first little ball."  S. ROSARIO acknowledged, and CORREA said, "And then that same day, before me leaving, you brought me another little ball.  So, you were left with three little whole balls, plus Soplo's.  And he says to me that he has just two times gone to your house."  S. ROSARIO said, "Hold on," and CORREA continued, "That's what I don't understand.  I don't understand what's going on.  Because it's not, the, the money is not, they don't, they not adding up.  There's something missing.  There's a little ball of ten that's missing, ma, definitely."  S. ROSARIO said, "I can definitely take a look in the house.  For sure, I can look."  CORREA said, "Check, or try to recall if you took to Mayi's house.  Is not at my house.  Imma call Mayi right now.  But, you know me."  S. ROSARIO then stated that she was at that time at CORREA's house.  CORREA said, "Okay, so check if it's around there or something, because exactly when I left, I left him with one of seven, which was the first one.  And the other day, I missed the

plane?  I had asked you for one."  S. ROSARIO agreed, and CORREA said, "That was two.  So three were left at your house and Soplo's."  S. ROSARIO asked, "The three at the house plus Soplo's?"  She then asked, "And there was seven in total?"  CORREA clarified that there were "five plus Soplo's makes it six."  CORREA then stated that something was wrong.  CORREA said, "If he said to me that he went two times to your house, then you are missing a ball of ten, definitely."  S. ROSARIO said she would have to look for it.

235.    Based on my training and experience, as well as my familiarity with this investigation, I believe that during this call, CORREA asked S. ROSARIO about drugs that she had stored at her residence, which is Target Location #3.  I believe that CORREA inquired about drugs that S. ROSARIO had given to him ("a first little ball"; "another little ball") and to an identified third party ("the tiny one"; "gone two times to your house").  I believe that CORREA stated that drugs were missing from the stash at S. ROSARIO's residence, and that S. ROSARIO agreed to look for it at Target Location #3.

*On July 9, 2021, S. ROSARIO Agreed to Provide Drugs to CORREA.*

236.    On July 9, 2021, at approximately 10:34 a.m., agents intercepted a call over Target Telephone #13 during which CORREA spoke with S. ROSARIO.  CORREA said, "[O]f ten and Soplo's."  S. ROSARIO said, "One what?" and CORREA repeated, "One of ten and Soplo's."  S. ROSARIO said, "Sounds good," and CORREA said, "I'm parked downstairs, you heard, mami?"  S. ROSARIO agreed.

237.    Based on my training and experience, as well as my familiarity with this investigation, I believe that during this call, CORREA told S. ROSARIO that he was outside of Target Location #3 and asked her to take drugs downstairs to him.

*On July 21, 2021, CORREA Inquired with S. ROSARIO about Drugs She Had on Hand.*

238.     On July 21, 2021, at approximately 2:48 p.m., agents intercepted a call over
Target Telephone #13 during which CORREA spoke with S. ROSARIO.  During the call, S.
ROSARIO said, "Stewie passed by here."  CORREA then said, "Alright, so all the five of, of ten
are finished?"  S. ROSARIO affirmed, and CORREA said, "Right now, what's left is what I told
you, 'Sonyi, maybe he'll go down to get that.'"  S. ROSARIO agreed, and CORREA said,
"Alright.  I already talked to him.  When those ten are sold, he's going to pick that up."  S.
ROSARIO agreed.

239.     Based on my training and experience, as well as my familiarity with this
investigation, I believe that CORREA inquired about drugs that S. ROSARIO had at her
residence, which is Target Location #3.  I believe that S. ROSARIO stated that "Stewie" had
picked up drugs from her residence ("passed by here").  I believe that CORREA stated that
another unidentified third party was going to pick up additional drugs from S. ROSARIO's
location when he had sold "ten" of drugs.

240.     As described herein, on August 20, 2021, investigators seized approximately 500
grams of cocaine from M. ROSARIO after she received the drugs from S. ROSARIO outside of
Target Location #3.

241.     Although investigators believe that CORREA is no longer sending packages to 33
Portland Street, I believe that documentary and other evidence of CORREA's drug distribution
activities still will be found inside of Target Location #3.

Target Location #4: 324 High Street, Third Floor, Lawrence, Massachusetts

242.     324 High Street, Lawrence, Massachusetts is part of a multi-family, three-story
residential structure clad in light blue clapboard siding, with black shutters and white trim.  324
and 326 High Street both are accessed via a single front door, which is painted in two shades of

blue and the top half of which is glass paned.  The area above the door to the residence is painted

with a yellow sunburst.  The door is marked in dark numbers with "324" and "326."  Target

Location #4 is located on the third floor of the residence.

243.    I believe that MARRERO resides at Target Location #4 because as set forth

above, CORREA was intercepted directing a drug customer to 324 High Street to meet with

MARRERO.  On December 10, 2021, agents observed MARRERO exit 324 High Street.

Precise location information for the telephone used by MARRERO also confirms that he resides

at 324 High Street.  I also am aware that until October 2021, MARRERO was on state probation.

He provided his probation officer with the address for Target Location #4 as his residence.

244.    MARRERO has been intercepted extensively discussing drugs that he maintains

on hand for CORREA and agreeing to make retail drug sales from his residence.[16]  For example,

on November 29, 2021, at approximately 1:41 p.m., agents intercepted a call over Target

Telephone #20 during which CORREA spoke with MARRERO. During the call, CORREA

asked MARRERO where he was.  MARRERO said, "At the house."  CORREA asked, "What do

you have left over?  Just the two chocolates?"  MARRERO affirmed.  CORREA asked, "Can I

tell Sherli to go pick it up over there?"  MARRERO said, "Um, yeah, she has to come up."

CORREA asked, "Has she ever gone up there?" and MARRERO said, "Yeah, she came once."

CORERA then said, "Alright, so I'm going to tell her."  MARRERO agreed.

245.    Based on my training and experience, as well as my familiarity with this

investigation, I believe that during this call, CORREA asked MARRERO what drugs he had left

---

[16] MARRERO previously resided at 8 Bailey Street in Lawrence.  I do not know
precisely when MARRERO moved to Target Location #4.  However, as set forth herein, within
the past several weeks he has been intercepted discussing drug activity at his residence, which I
know is now Target Location #4.  Based on the information MARRERO provided to his
probation officer, I know that MARRERO was living at Target Location #4 at least as of October
2021.

for distribution.  I believe that CORREA confirmed that MARRERO had "two" of a quantity of heroin or fentanyl ("chocolates").  I believe that CORREA then asked if he could send a customer ("Sherli") to MARRERO's residence (Target Location #4) to pick up the drugs, and that MARRERO affirmed but said that she would have to come to his apartment rather than meet downstairs ("she has to come up").  I believe that CORREA stated that he would relay the instructions to Sherli.

246.    Accordingly, I believe that evidence of CORREA's and MARRERO's drug distribution activity will be located inside of Target Location #4.

Target Location #5: 160 Parker Street, Third Floor, Lawrence, Massachusetts

247.    160 Parker Street, Lawrence, Massachusetts is a three-story multi-family residence covered in white clapboard siding and grey shingle siding.  The structure has white trim.  There is a parking area to the right of the building.  The building is attached on the left to a church.  The front door is located on the left side of the face of the building.  The front door is grey and is marked with the number "160."  Target Location #5 is the third floor apartment.

248.    I believe that J. MARTINEZ resides at Target Location #5 because agents have periodically observed his car – a grey Mercedes with Massachusetts registration 2FZK77 registered to Donald Pappalardo, 39 Frye Road, Methuen, Massachusetts – parked in the driveway of 160 Parker Street[17] and have observed J. MARTINEZ entering the residence via the back door on multiple occasions.  Most recently, agents observed J. MARTINEZ's car parked at 160 Parker Street on December 9, 2021.  On or about December 8, 2021, investigators spoke with an employee of the property management company that owns 160 Parker Street.  The employee's name is known to me.  The employee stated that the driver of the grey Mercedes

---

[17] Investigators have observed J. MARTINEZ driving the grey Mercedes over an extended period of time.

frequently parked in the driveway of 160 Parker Street lives in the third floor apartment with his mother and a girl. Based on intercepted calls, I am aware that J. MARTINEZ resides with his grandmother and with his girlfriend. For all of these reasons, I believe that J. MARTINEZ resides at Target Location #5.

249.     As set forth herein, J. MARTINEZ is a long-term drug distributor. On or about October 22, 2021, investigators seized a package addressed to J. MARTINEZ (at Target Location #9) that contained approximately 500 grams of cocaine. J. MARTINEZ went to the Lawrence Post Office to attempt to retrieve the package.

250.     Prior to that, on or about April 9, 2021, investigators seized a package addressed to Carlos Flores at Target Location #5. The package contained approximately one kilogram of cocaine. In addition, on or about July 23, 2021, USPS delivered a package sent from Puerto Rico addressed to Sandra Martinez at 160 Parker Street in Lawrence. Based on my training and experience, as well as my familiarity with this investigation and the weight of the package, I believe that package contained approximately 500 grams of cocaine. Agents observed an unidentified male take the package into 160 Parker Street.

251.     In addition, in August 2021, CORREA retrieved half a kilogram of cocaine from Target Location #5 and distributed it to a customer. More specifically, on August 10, 2021, at approximately 11:52 a.m., agents intercepted a call over Target Telephone #13 during which CORREA spoke with Richie Gonzalez. During the call, Gonzalez asked if CORREA still had "that twerk" he had been talking about. Gonzalez then clarified that he was referring to "the half." CORREA affirmed and then stated that it was "the fire one, too." Gonzalez asked if CORREA could "give [him] a couple hours with it." CORREA affirmed, and Gonzalez said that in an hour, he would "go to grab it."

252.     At approximately 12:25 p.m., CORREA used Target Telephone #13 to call J. MARTINEZ.  During the call, CORREA stated, "I think yours is going to be sold today."  He then clarified, "The half."  J. MARTINEZ said he would be ready.  CORREA said, "Richie told me at three, and he is going to have the half around six."

253.     At approximately 1:14 p.m., agents intercepted a call over Target Telephone #13 during which CORREA spoke with Gonzalez.  During the call, Gonzalez said he was "ready."  CORREA asked, "Can you pass by my brother's house?"  Gonzalez said, "Huh?" and CORREA said, "Would you like to pick it up at my brother's house?  Or I pick it up.  I'll pick it up now."  Gonzalez asked which brother, and CORREA said, "Bebo."  Gonzalez said he didn't care, and CORREA said, "Sounds good.  I'll tell him to have it ready, then.  Go ahead."

254.     Immediately thereafter, CORREA called J. MARTINEZ using Target Telephone #13.  During the call, CORREA asked, "Are you at the house?"  J. MARTINEZ negated and said he was going there at that time.  CORREA said he would tell "Richie" not to go "over there."  J. MARTINEZ then said he could see if Nani was home, and CORREA said, "If you want, I'll go over there, and I'll pick it up then."  J. MARTINEZ said, "Yeah, bro.  Pick it up.  It's there.  I was going to go over there now.  But if you want to be faster, it's over there, inside the drawer.  When you go to my bedroom."  J. MARTINEZ continued to explain, "Where the hats are, where the hats are underneath.  You will see, in the same, in the first drawer.  You will see, you put your hand down like that, and you will see it.  You will find it."

255.     Based on my training and experience, as well as my familiarity with this investigation, I believe that during this series of calls, Gonzalez asked to purchase half a kilogram of drugs from CORREA.  I believe that CORREA agreed to supply the drugs, which he said were very high quality.  I believe that CORREA then called J. MARTINEZ and told him

that he had a buyer for the half kilogram of drugs that J. MARTINEZ had available ("yours is going to be sold today").  I believe that CORREA told J. MARTINEZ the price he expected to receive for the drugs.  I believe that when Gonzalez said he was ready to pick up the drugs, CORREA told him to go to J. MARTINEZ's house ("my brother's"; "Bebo").  I believe that J. MARTINEZ, who was not at home, then described to CORREA where in his residence the drugs were located.

256.    Agents conducting surveillance that day observed CORREA leave 190 Carleton Street at approximately 1:18 p.m. and travel to 160 Parker Street, where Target Location #5 is located.  CORREA parked outside of 160 Parker Street and entered the residence.  He was then intercepted talking again with J. MARTINEZ about the location of the drugs.  While CORREA was inside of 160 Parker Street, agents observed an Acura SUV arrive and park in the driveway of 160 Parker Street.  Agents have once previously observed Gonzalez driving the same Acura SUV.  At approximately 1:26 p.m., CORREA exited 160 Parker Street.  At that time, CORREA was out of investigators' view.  Thereafter, agents observed CORREA walk down the driveway of 160 Parker Street, and CORREA and the Acura left the area separately.  A short time later, CORREA and Gonzalez were intercepted discussing cars that they had seen in the area that they believed were police surveillance.

257.    Based on my training and experience, I believe that CORREA retrieved half a kilogram of cocaine from inside of Target Location #5 and distributed it to Gonzalez outside of Target Location #5.

258.    I therefore believe that evidence of J. MARTINEZ's drug distribution activities will be found inside of Target Location #5.

Target Location #6: 244 Mount Vernon Street, Apartment 5, Lawrence, Massachusetts

259.     244 Mount Vernon Street, Lawrence, Massachusetts is a red brick multi-unit apartment building.  The building has white trim, including two sets of white balconies on the face of the building.  The front door, which is glass, is at the top of a flight of concrete steps and is covered by a red awning marked with the number "244" in white numbers.  There is a white fence in front of the property.  Target Location #6 is Apartment 5.

260.     I believe that L. MARTINEZ resides at Target Location #6 based on the fact that agents have observed L. MARTINEZ's car parked outside of 244 Mount Vernon Street on multiple occasions.[18]  Precise location information for L. MARTINEZ's telephone also shows that L. MARTINEZ is frequently in the area of 244 Mount Vernon Street, including during the overnight hours.  Most recently, on December 8, 2021, L. MARTINEZ's telephone was in the area of 244 Mount Vernon Street during the overnight hours and his car was parked outside of the building.  I am aware that L. MARTINEZ's girlfriend is Ashley Abreu; I know this because he previously was driving a car registered to her at Target Location #6, and when stopped by police on August 20, 2021, L. MARTINEZ stated that he was driving his girlfriend's car and that they lived together on Mount Vernon Street.  In addition, L. MARTINEZ was intercepted stating that he was at his "woman's place" on Mount Vernon, after which CORREA directed another party to go to Mount Vernon to his "brother's place."  CORREA also was intercepted telling M. ROSARIO to go to see "Luis" at "244 Mount Vernon."  The utilities for Target Location #6 are subscribed to Ashley Abreu.

---

[18] I am familiar with L. MARTINEZ's vehicle – a blue Acura TSX with Massachusetts registration 3AVK29 registered to Luis MARTINEZ, 23F Boxford Street, Lawrence, Massachusetts – because agents have observed him driving it on multiple occasions during this investigation.

261.    L. MARTINEZ has been intercepted asking CORREA to direct drug customers to go to "Mount Vernon," which I believe is a reference to Target Location #6.  One such example is set forth above in paragraph 93.

262.    Similarly, on August 9, 2021, at approximately 10:13 p.m., agents intercepted a call over Target Telephone #13 during which CORREA spoke with MARRERO.  MARRERO said, "Ashley is here.  Um, who's working?"  CORREA said, "Luis."  MARRERO said, "I've been calling him; he's not picking up."  CORREA asked, "What did she want?"  MARRERO asked Ashley what she needed and then told CORREA, "Two.  A whole one."  CORREA said, "Huh?" and MARRERO repeated, "A whole one."  CORREA said he would call "Luis."  CORREA could then briefly be heard using another telephone to call "Luis."

263.    At approximately 10:15 p.m., agents intercepted a call over Target Telephone #13 during which CORREA told Ashley (who was using MARRERO's telephone), "You gotta go to two forty-four Mount Vernon, sweetie."  Ashley asked where, and CORREA repeated, "Two forty-fo, two forty-four Mount Vernon."  Ashley stated that she didn't have a phone and asked if she could "work" from where she was.  She then clarified, "[I]f you could come over here?"  CORREA said, "No, girl.  He can't head up there.  He doesn't have a car.  He doesn't have a car.  You have to go there."

264.    Based on my training and experience, I believe that Ashley, a drug customer, had gone to MARRERO's residence looking for drugs ("Two.  A whole one.").  I believe that MARRERO was not working that night and called CORREA to find out who was distributing drugs that night.  I believe that CORREA stated that L. MARTINEZ ("Luis") was distributing drugs.  I believe that CORREA called L. MARTINEZ to tell him that Ashley wanted to purchase

a "whole one" of drugs, and that CORREA then instructed Ashley to go to 244 Mount Vernon

Street, which is where Target Location #6 is located, to obtain the drugs.

265.    As a result of the foregoing, I believe that evidence of L. MARTINEZ's drug

distribution activities will be found inside of Target Location #6.

Target Location #7: 111 Margin Street, Second Floor, Lawrence, Massachusetts

266.    111 Margin Street, Lawrence, Massachusetts is part of a three-story, multi-family

residence.  The building is clad in white clapboard siding and has white trim.  There are two

front doors to the building, which are white and are accessed via a set of grey wooden steps.  The

doors are covered by an overhang with a triangular pediment.  The door to 111 Margin Street is

the right-hand front door.  Target Location #7 is the second floor apartment.

267.    I believe that MARTINEZ resides at Target Location #7 because over the course

of this investigation, agents have observed MARTINEZ regularly coming and going from 111

Margin Street.  A GPS tracking device affixed to MARTINEZ's vehicle also showed that his car

was frequently parked at 111 Margin Street, including during the overnight hours.  MARTINEZ

is the subscriber to utilities at Target Location #7.

268.    As set forth in part herein, agents have frequently observed a courier now

believed to be HERNANDEZ MERCEDES delivering drugs to MARTINEZ inside of 111

Margin Street.  In addition, on November 11, 2021, investigators at the Middleton House of

Correction seized drugs from SANCHEZ that had been given to him by MARTINEZ.  Although

agents did not see MARTINEZ leave directly from 111 Margin Street before meeting with

SANCHEZ, the two met blocks away from 111 Margin Street, and MARTINEZ arrived at the

meeting on foot.  As such, I believe that MARTINEZ took the drugs from Target Location #7 to

deliver them to SANCHEZ.  As such, I believe that evidence of MARTINEZ's drug trafficking will be located inside of Target Location #7.

Target Location #8: 170 Washington Street, Apartment 509, Haverhill, Massachusetts

269.    170 Washington Street, Haverhill, Massachusetts is a multi-unit apartment building.  It is grey with maroon trim and decorative detailing.  The entrance to the building is located at the northeast corner of the building.  The door is glass and is marked with the numbers "170."  Target Location #8 is Apartment 509.

270.    I believe that WILL resides at Target Location #8.  During the course of the investigation, I have observed his vehicle parked in the parking lot at 170 Washington Street.[19] In addition, precise location information for his telephone shows that the phone currently used by WILL is frequently located in the area of 170 Washington Street, including during the overnight hours.  Agents also have observed WILL outside of 170 Washington Street and entering the building.  Furthermore, when WILL and Ramos were stopped by police on November 9, 2021, Ramos provided Target Location #8 as her address.  She is the subscriber to utilities at Target Location #8, and management for the apartment building has confirmed that she resides in Target Location #8.  Based on intercepted communications, WILL resides with Ramos.

271.    Based on the investigation, and as partially set forth herein, I am aware that WILL is a long-term drug distributor.  WILL worked as a courier for DEJESUS prior to DEJESUS's arrest, and in the wake of DEJESUS's arrest, WILL assumed responsibility for DEJESUS's drug distribution business.

---

[19] WILL has driven multiple vehicles during the course of this investigation.  I am familiar with those vehicles because other agents and I observed him driving them on multiple occasions.  During October and November 2021, WILL drove a blue Toyota Highlander, which I observed parked at 170 Washington Street.  I am familiar with that car because it was seized by law enforcement while WILL was driving it.

272.    Agents have intercepted calls that show that WILL keeps drugs or drug proceeds at Target Location #8.

273.    For example, on October 23, 2021, agents intercepted a call over Target Telephone #18 during which WILL spoke with Ramos.  During the call, Ramos stated that she and a third party had put in a service request to get something cleaned, and a third party had listed WILL's telephone number as the contact number.  WILL then asked, "Did we take that off the table?"  Ramos said, "Yeah, baby, I did."  WILL asked, "Where did you put that at?"  Ramos replied, "In the cabinet."  WILL then asked if "they" were "gonna go," and Ramos said that "they" would call WILL to schedule an appointment.  Based on my training and experience, as well as my familiarity with this investigation, I believe that during this call WILL and Ramos discussed the fact that a service person would be going to their residence.  I believe that WILL inquired as to whether Ramos had put drugs, drug paraphernalia, or drug proceeds ("that") away, and that Ramos confirmed she had put it in a cabinet.

274.    Similarly, on October 25, 2021, at approximately 11:25 a.m., agents intercepted a call over Target Telephone #18 during which WILL spoke with Ramos.  During the call, WILL asked, "You sleeping or you awake?"  Ramos said she was sleeping.  WILL said, "Okay.  Nah, I was gonna tell you when you woke up [unintelligible], like nigga, like probably like twenty-seven, thirty balls.  And I wanted you to make some of those.  I was gonna tell you to make like twenty of them, real quick.  You'd make 400.  You already know how to do them exactly right, right?"  Ramos said, "No.  I would [unintelligible], but I don't know how to do them. [Unintelligible.]"  WILL then said that he would call "Bimbo."  Based on my training and experience, as well as my familiarity with this investigation, I believe that during this call, WILL asked Ramos to quickly package twenty eighth-ounces ("balls") of cocaine.  I believe that the

request indicates that WILL had cocaine stored at the residence he shares with Ramos, that is, Target Location #8.

275.    Likewise, on October 31, 2021, agents intercepted a call over Target Telephone #18 during which WILL spoke with DEJESUS.  During the call, DEJESUS asked if an unidentified third party had given WILL "those."  WILL negated and said he was going to meet up with him the next day.  DEJESUS then asked, "Do they got 'em in packs?"  WILL affirmed and then when DEJESUS began to ask, "And what are those, do they say like the eight, eight, or--," WILL said, "They're eight milligram."  DEJESUS later said, "Nigga, they're probably more than 200 things.  He said they probably two-thirty."  WILL said, "I'mma count them when I get to the crib.  I left it in the bag."  DEJESUS said, "Nah, don't worry.  [Unintelligible], oh, alright, alright.  Where in the crib?"  WILL said, "Yeah, they're at my crib."  WILL said he was at Target in Haverhill.  Based on my training and experience, as well as my familiarity with this investigation, I believe that WILL was discussing Suboxone strips ("eight milligrams") that he had received and had left at his residence ("my crib"), which is Target Location #8.

276.    On November 8, 2021, at approximately 3:43 p.m., agents intercepted a call over Target Telephone #18 during which WILL spoke with DEJESUS.  During the call, which lasted fourteen minutes, they talked about pills and the price a third party was charging for them.  They then talked about various people with whom WILL had been trying to make contact.  DEJESUS then asked, "Did you did anymore last night?"  WILL said, "I did like thirty of them.  Like, I finished the thirties that I had there.  I thought [unintelligible] it wasn't moving."  DEJESUS said, "Yeah, yeah, yeah.  You probably [unintelligible]."  WILL then said, "What about what I left on the table?  I just finished.  Put some more later when I get to the crib."  Based on my training and experience, I believe that DEJESUS asked about drugs that WILL had on hand.  I

believe that WILL said he had distributed all of a quantity of drug he had prepared ("finished the thirties that I had there").  I believe that WILL said he had thought that the drugs were not selling.  I believe that he further stated that he could prepare more drugs for distribution when he got home ("to the crib"), that is, to Target Location #8.

277.     Finally, as set forth above, on October 14, 2021, after delivering drugs to EATON, WILL returned directly to Target Location #8.

278.     Accordingly, I believe that evidence of WILL's drug distribution activities will be located inside of Target Location #8.

Target Location #9: 10 Clarence Terrace, Second Floor, Lawrence, Massachusetts

279.     10 Clarence Terrace, Lawrence, Massachusetts is a three-story residential structure.  The building is clad in beige clapboard siding with white trim.  The door to the residence faces towards the left side of the building.  Target Location #9 is the second floor apartment.

280.     Based on physical surveillance and information on file with the Massachusetts Registry of Motor Vehicles, I believe that PEREZ FRIAS lives at Target Location #9.  Specifically, PEREZ FRIAS's driver's license lists Target Location #9 as his residence.  In addition, precise location information for PEREZ FRIAS's telephone shows that the phone is frequently located at 10 Clarence Terrace, including during the overnight hours.

281.     As set forth herein, J. MARTINEZ shipped to or had shipped to him at Target Location #9 a package containing approximately 500 grams of cocaine.  PEREZ FRIAS was intercepted discussing the fact that the package did not arrive.  I am aware that on or about June 25, 2021, USPS delivered a package shipped from Puerto Rico to Luis Perez at Target Location #9.  That same day, USPS delivered a package shipped from Puerto Rico to "Josue CORREA" at

34 Coolidge Street, which is part of the same residential structure as Target Location #1.  Based on my training and experience, my familiarity with this investigation, and the weight of the package delivered to Target Location #9 on June 25, I believe the package contained approximately 500 grams of cocaine.  I also am aware that on September 15, 2021, USPS delivered a package shipped from Puerto Rico to Luis Perez at Target Location #9.  That same day, USPS delivered a package to 281 Auburn Street in Manchester, New Hampshire, which is L. MARTINEZ's New Hampshire residence.  Based on my training and experience, as well as my familiarity with this investigation, and the weight of the package delivered to Target Location #9 on September 15, I believe the package contained approximately 500 grams of cocaine.

282.    In addition, as set forth herein, PEREZ FRIAS has been intercepted telling CORREA about supplies of drugs he is maintaining for CORREA at his "house."  Accordingly, I believe that evidence of PEREZ FRIAS's and CORREA's drug trafficking activities will be located inside of Target Location #9.

Drug Traffickers' Use of Residences and Cellular Telephones

283.    Based on my training and experience, and the collective experience of other investigators participating in this investigation, I know that traffickers of controlled substances frequently maintain, at their residences or stash locations, quantities of illicit drugs to maintain their ongoing drug business. I also know that traffickers of controlled substances usually keep, in addition to drugs, paraphernalia for the packaging, diluting, cutting, weighing, processing, and distributing controlled substances, including scales, plastic bags, cutting agents, and utensils at their residences or stash locations. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is

generally a common practice for drug traffickers to store drug-related paraphernalia in their residences or stash locations for longer periods of time than they keep drugs there.

284.    I am aware, based on my training and experience, that drug traffickers will frequently store drugs, drug paraphernalia, drug proceeds, and documents relating to their drug trafficking at more than one location.  This practice is designed to avoid law enforcement seizure and/or theft of large quantities of drugs or drug proceeds.  It also allows drug traffickers to distance themselves from some or all of the evidence of their drug trafficking in the event of their apprehension by law enforcement or seizure of the drugs or drug proceeds by law enforcement.  In this investigation in particular, I am aware that CORREA has simultaneously maintained multiple drug stash locations, and that many of these locations have been at the residences of his criminal associates.  I also am aware that REYES employed HERNANDEZ MERCEDES to maintain a drug stash location for him at HERNANDEZ MERCEDES's residence.

285.    Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug-traffickers, it is generally a common practice for drug traffickers to maintain in their residences and drug stash locations records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, record-keeping is necessary to keep track of amounts paid and owed, and such records are often kept close at hand so that current balances can be verified and recorded.  Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug

traffickers often maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

286.    Even when drug dealers store their drugs outside their residence, I know that they often will keep records relating to these offsite storage locations at their primary residence.  Such documents include rental or storage property agreements and receipts.

287.    Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that it is generally a common practice for traffickers to conceal at their residences either the proceeds from drug sales or monies to be used to purchase controlled substances. Drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances, and evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking are often kept in their residences. Moreover, the cash proceeds of drug trafficking often contain traces of the narcotics sold or bought by the drug dealers.

288.    Moreover, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities, and many of these cellular telephones are kept at their residences. It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses. Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them. Therefore, while it is common for drug

traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones. As a result, I am aware that collections of cell phones have been found during drug trafficking search warrants that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

289.    When drug traffickers amass proceeds from the sale of drugs, they often attempt to launder/legitimize these profits, or otherwise conceal them from discovery by law enforcement.  In an effort to accomplish these goals, drug traffickers often place assets, such as vehicles and residences, in the names of other persons to conceal their true ownership and the manner in which they were acquired. Records reflecting the implementation of such deceptive practices, such as deeds, titles, and service records, are likely to be found inside the residence of the drug trafficker.

290.    Finally, as noted above, evidence of drug crimes can be found in the cell phones and smart phones referenced in the preceding paragraphs. Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages.  From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachments B-1 and B-2 on their cellular telephones.

291.    It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear. Actions such as internet searching or emailing, in addition to calling and text messaging, can now be performed from many cell phones.  In addition, those involved in drug trafficking crimes commonly

communicate using multiple cellular telephones. Contemporaneous possession of multiple cellular telephones is, therefore, evidence of drug trafficking. Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking, particularly in a case involving the interception of communications between drug traffickers. Such numbers can confirm identities of particular speakers and the occurrence of certain events.

292.    As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device. Storing this information can be intentional, for example, by saving an e-mail as a file on a computer or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally. Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a computer or a cell phone. In addition to electronic communications, a user's Internet activities generally leave traces in the web cache and Internet history files. A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a computer or a cell phone, used such a device.

293.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they often can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files,

may reside in free space or slack space -- that is, in space on a device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space -- for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from an electronic storage device depends less on when the file was sent, downloaded, or viewed than on a particular user's operating system, storage capacity, and habits.

294.    I have participated in the execution of numerous search warrants at the residences of drug traffickers similar to the targets of this investigation. In a substantial number of residential searches executed in connection with the drug investigations in which I have been involved, the following types of drug-related evidence typically have been recovered in both conventional and electronic formats:

1.   controlled substances;

2.   paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, microwave ovens, heat-sealing devices, and diluents such as mannitol, mannite, and inositol;

3.   books, records, receipts, notes, ledgers, letters, and other papers relating to the distribution of controlled substances, travel for the purpose of acquiring and/or

distributing controlled substances, and to monetary transactions involving the proceeds from the sale of controlled substances;

   i.  personal books, papers, and other electronic devices reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances, money laundering, and the criminal use of communication facilities;

4. cash, currency, and records relating to the generation of income from the sale of controlled substances and the expenditure of such income, including money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as consumer items such as electronic equipment, vehicles, jewelry, and precious metals such as gold and silver, and precious gems such as diamonds - it should be noted that possession of the valuable items referenced in this paragraph, particularly by individuals with no substantial legitimate source of income, is evidence of drug trafficking as opposed to drug use;

5. documents and other records indicating travel in interstate and foreign commerce, such as maps, GPS coordinates, navigation coordinates, travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills and related communications;

6. cellular telephones, smart phones, electronic tablet devices, and other electronic media utilized for communication, transportation, and data acquisition and retention purposes related to acquiring and distributing illegal drugs and proceeds, including incoming and outgoing call and text message logs, contact

lists, photo and video galleries, sent and received text messages, online searches and sites viewed via the internet, online or electronic communications sent and received (including email, chat, and instant messages), sent and received audio files, navigation, mapping, and GPS files, telephone settings (including contact lists) text messages, and related identifying information such as telephone identification numbers, call forwarding information, messages drafted but not sent, and voice messages;

7.  firearms and other dangerous weapons; and

8.  identification evidence and/or indicia, such as cell phones with particular numbers, mail, deeds, leases, rental agreements, photographs, bills, and identification documents, that tend to identify the person(s) in residence, occupancy, control, or ownership of subject premises and/or subject communication devices.

295.   Based on all of the information I have obtained during the course of this investigation, and for the reasons more specifically set forth herein, I believe that the Target Subjects are engaged in drug trafficking.  I believe that evidence of their drug trafficking offenses will be found inside each of the Target Locations and on certain cellular telephones seized therefrom.

## UNLOCKING A DEVICE USING BIOMETRIC FEATURES

296.   I know from my training and experience, as well as from information found in publicly available materials, that some models of cellphones made by Apple and other manufacturers offer their users the ability to unlock a device via the use of a fingerprint or through facial recognition, in lieu of a numeric or alphanumeric passcode or password.

297.   On the Apple devices that have this feature, the fingerprint unlocking feature is called Touch ID. If a user enables Touch ID on a given Apple device, he or she can register up to five fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor.  In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days.  Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

298.   The passcode that would unlock the Subject Devices/Apple devices found during the search of the Target Locations is not currently known to law enforcement. However, during the course of this investigation, a number of Target Subjects have used Apple iPhones to conduct their drug and money laundering business. Thus, it may be useful to press the fingers of the users of the Subject Devices/Apple devices found during the search of the Target Locations to the device's fingerprint sensor or to hold the device up to the face of the owner in an attempt to unlock the device for the purpose of executing the search authorized by the requested warrants. The government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by these warrants.

299.   In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the

device.  However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.  Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it may be necessary for law enforcement to have the ability to require any occupant of the Target Locations to press their finger(s) against the sensor of the locked device(s) or place the device(s) in front of their face(s) in order to attempt to identify the device's user(s) and unlock the device(s).

300.    For these reasons, I request that the Court authorize law enforcement to press the fingers (including thumbs) of the Target Subjects or co-conspirators identified in this affidavit to the sensors of the devices or place the devices in front of their faces for the purpose of attempting to unlock the devices in order to search the contents as authorized by the requested warrants.

CONCLUSION

301.    Based on the foregoing, I believe probable cause exists to conclude that the Target Subjects have conspired and continue to conspire to possess with intent to distribute, and to distribute fentanyl, cocaine, and other controlled substances, in violation of 21 U.S.C. § 846, and

//

//

//

//

that evidence of drug trafficking, as set forth in Attachments B-1 and B-2, will be found inside

the Target Locations and on cellular telephones seized therefrom.

/s/ Robert R. LeFebre

_____

Robert R. LeFebre
Task Force Officer
Homeland Security Investigations

Sworn to by telephone in accordance with Fed. R. Crim. Pr. 4.1 on December 13, 2021,

M. PAGE KELLEY
United States Magistrate Judge
District of Massachusetts

**ATTACHMENT A**

Wiretap Authorizations Granted by F. Dennis Saylor IV in M.B.D. No. 20-91676-FDS

| Telephone Number | User | Wire or Electronic | Date of Authorization |
|---|---|---|---|
| (978) 601-8654 (Target Telephone #1) | Pablo PIZARRO-ROSA | Wire | December 14, 2020 |
| | | Wire | January 15, 2021 |
| | | Wire | February 19, 2021 |
| | | Wire | March 22, 2021 |
| | | Wire | April 23, 2021 |
| | | Wire & Electronic | October 13, 2021 |
| (978) 983-4122 (Target Telephone #2) | Felix ROSARIO | Wire & Electronic | January 15, 2021 |
| (978) 201-7684 (Target Telephone #3) | Felipe MARTINEZ | Wire | January 15, 2021 |
| | | Wire | March 22, 2021 |
| | | Wire | April 23, 2021 |
| | | Wire | August 24, 2021 |
| (617) 602-2454 (Target Telephone #4) | Elvis DEJESUS | Wire | February 19, 2021 |
| | | Wire | April 23, 2021 |
| (857) 269-7671 (Target Telephone #5) | Elvis DEJESUS | Wire | February 19, 2021 |
| | | Wire | March 22, 2021 |
| | | Wire | April 23, 2021 |
| | | Wire | June 11, 2021 |
| (978) 242-4597 (Target Telephone #6) | Elvis DEJESUS & Felipe MARTINEZ | Wire | February 19, 2021 |
| | | Wire | March 22, 2021- |
| (978) 984-2685 (Target Telephone #7) | Othoniel Lara Gonzalez a/k/a CHIRIPA | Wire | February 19, 2021 |
| (978) 701-1903 (Target Telephone #8) | Angel AYALA-ROQUE | Wire | February 19, 2021 |
| (939) 489-2340 (Target Telephone #9) | Joseph CORREA | Wire & Electronic | April 23, 2021 |
| (978) 902-6399 (Target Telephone #10) | Joseph CORREA | Wire | June 11, 2021 |
| (978) 885-2946 (Target Telephone #11) | Jose MARTINEZ | Wire | June 11, 2021 |

| Telephone Number | User | Wire or Electronic | Date of Authorization |
|---|---|---|---|
| (978) 457-1526 (Target Telephone #12) | Freddy REYES CONCEPCION | Wire & Electronic | June 11, 2021 |
| | | Wire & Electronic | July 23, 2021 |
| | | Wire & Electronic | August 24, 2021 |
| | | Wire & Electronic | October 13, 2021 |
| | | Wire & Electronic | November 19, 2021 |
| (978) 885-4042 (Target Telephone #13) | Joseph CORREA | Wire & Electronic | June 25, 2021 |
| | | Wire & Electronic | July 23, 2021 |
| | | Wire & Electronic | August 24, 2021 |
| | | Wire & Electronic | October 13, 2021 |
| (646) 719-4776 (Target Telephone #14) | Alex Rafael HERNANDEZ MERECEDES | Wire & Electronic | June 25, 2021 |
| (939) 484-1006 (Target Telephone #15) | FNU LNU a/k/a "FELIX" | Wire | July 23, 2021 |
| | | Wire | August 24, 2021 |
| (646) 643-3021 (Target Telephone #16) | Joseph CORREA | Wire & Electronic | August 24, 2021 |
| (857) 389-0066 (Target Telephone #17) | Fauris GUERRERO VALDEZ | Wire & Electronic | October 13, 2021 |
| (978) 376-4901 (Target Telephone #18) | William Rivadeneira a/k/a "WILL" | Wire | October 13, 2021 |
| | | Wire & Electronic | November 19, 2021 |
| (978) 237-7908 (Target Telephone #19) | Joseph CORREA | Wire & Electronic | November 19, 2021 |
| (845) 821-6727 (Target Telephone #20) | Joseph CORREA | Wire & Electronic | November 19, 2021 |
| (917) 514-5724 (Target Telephone #21) | William Rivadeneira a/k/a "WILL" | Wire & Electronic | November 19, 2021 |

# ATTACHMENT B-1

(Items to be Seized)

All records from May 1, 2020, to the present, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1), 843, and 846 (possession with intent to distribute and distribution of a controlled substance, conspiracy to distribute controlled substances, and use of a communications facility in the commission of a drug trafficking crime), including:

1. Controlled substances and drug distribution paraphernalia.

2. Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances and the laundering of drug proceeds, including records of sales, records of purchases, log books, drug ledgers, personal telephone/address books containing the names of purchasers and suppliers of controlled substances, electronic organizers, telephone bills, bank and financial records, and storage records, such as storage locker receipts and safety deposit box rental records and keys.

3. Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys, and items commonly maintained in vehicles, such as registration, insurance, and identification documents.

4. Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

5. Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

6. Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

7. Cellular telephones reasonably believed to contain the items set forth above and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking and/or referencing

individuals engaged in drug trafficking, located in the memory of any such mobile telephone, including but not limited to:

 a. Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

 b. Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

 c. Text messages both sent to and received from the device(s) (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

 d. Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

 e. GPS data;

 f. Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

 g. Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or individuals engaged in drug trafficking;

 h. All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

 i. Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

During the search of the Target Location, law enforcement personnel are authorized to press the fingers (including thumbs) of individuals found at the Target Location to the sensor of cellular telephones authorized to be seized by this warrant and/or to hold any such devices in front of such individuals' faces.

**ATTACHMENT B-2**

(Items to be Seized)

All records from May 1, 2020, to the present, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1), 843, and 846 (possession with intent to distribute and distribution of a controlled substance, conspiracy to distribute controlled substances, and use of a communications facility in the commission of a drug trafficking crime), including:

1. Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances and the laundering of drug proceeds, including records of sales, records of purchases, log books, drug ledgers, personal telephone/address books containing the names of purchasers and suppliers of controlled substances, electronic organizers, telephone bills, bank and financial records, and storage records, such as storage locker receipts and safety deposit box rental records and keys.

2. Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys, and items commonly maintained in vehicles, such as registration, insurance, and identification documents.

3. Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

4. Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

5. Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

6. Cellular telephones reasonably believed to contain the items set forth above and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking, located in the memory of any such mobile telephone, including but not limited to:

a. Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

b. Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

c. Text messages both sent to and received from the device(s) (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

d. Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

e. GPS data;

f. Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

g. Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or individuals engaged in drug trafficking;

h. All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

i. Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

During the search of the Target Location, law enforcement personnel are authorized to press the fingers (including thumbs) of individuals found at the Target Location to the sensor of cellular telephones authorized to be seized by this warrant and/or to hold any such devices in front of any such individuals' faces.